RICHARDSON Co. *v.* UNITED STATES (No. 1794).[1]

1. EVIDENCE—JUDICIAL NOTICE—FARM TRACTORS.

The court may take judicial notice of advancement in methods of agricultural pursuits. It judicially knows that slow-traveling, heavy-duty tractors are everywhere to a great degree supplanting the horse as motive power on the farm, and that these machines are so constructed that they travel too slowly and are too heavy for hauling on the modern roadway, their construction fitting them only for slow travel and field work on a more yielding surface.

2. USE, CHIEF, NOT INCIDENTAL, THE TEST.

The fact that farm tractors are incidentally or exceptionally used for other than agricultural purposes is not sufficient to deny them classification as agricultural implements.

3. CONSTRUCTION, PARAGRAPH 391, TARIFF ACT OF 1913—"AGRICULTURAL IMPLEMENTS."

The known general use of farm tractors demonstrates them commercially and practically necessary to agriculture; and such, when chiefly used for agricultural purposes, are entitled to classification as "agricultural implements." under paragraph 391, tariff act of 1913.

4. CARBURETERS FOR FARM TRACTORS.

Carbureters, shown to be so designed and constructed that they can only be affixed to and made parts of certain tractors, which tractors are shown to be designed, constructed, and chiefly used for plowing and thrashing—uses necessary and peculiar to the production of food and raiment for man—are entitled to free entry as parts of agricultural implements (par. 391, tariff act of 1913) and are not dutiable as manufactures of metal (par. 167).

## United States Court of Customs Appeals, May 28, 1917.

APPEAL from Board of United States General Appraisers, G. A. 7982 (T. D. 36770). [Reversed.]

*Curie, Smith & Maxwell* (*Thomas M. Lane* and *Albert MacC. Barnes, jr.*, of counsel) for appellants.

*Bert Hanson*, Assistant Attorney General (*Martin T. Baldwin*, special attorney, of counsel), for the United States.

[Oral argument, May 3, 1917, by Mr. Lane and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

The issue presented by this appeal is the proper dutiable classification of carbureters for certain tractors. The controversy presents for decision the inclusive scope of paragraph 391 of the present tariff act, reading:

391. Agricultural implements: Plows, tooth and disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons, and carts, and all other agricultural implements of any kind and description, whether specifically mentioned herein or not, whether in whole or in parts, including repair parts.

The imported articles were classified for dutiable purposes by the collector of customs at the port of Detroit as manufactures of metal

---

[1] T. D. 37289 (33 Treas. Dec., 85).

under pargaraph 167 of that act.   On due protest that decision was
affirmed by the Board of General Appraisers and importers make
this appeal.   The importers, appellants, claim their property dutiable
as parts of agricultural implements under paragraph 391.

Question is early made in the case whether or not a farm tractor is
an "agricultural implement."   If not so appellants, of course, must
fail.   The court is of the opinion, however, that a farm tractor is an
agricultural implement.   We are not without highly respectable
authority in support of this view.   The argument to the contrary
by the Government in effect is "that an engine whose sole function
is the furnishing of power for the operation of agricultural implements
is not itself an agricultural implement," and that a traction engine
is not an "implement."

The precise principle was before the Supreme Court of Kansas in
Jackman v. Lambertson (71 Kans., 138; 80 Pac, Rep., 55).   The
"syllabus by the court" concisely and authoritatively states the
court's view, as follows:

> The thrashing separator, *traction* engine, belts, and all parts necessary to consti-
> tute a thrashing machine, kept by such person for the purpose of carrying on his
> business of thrashing, constitutes an implement under said subdivision 8, and, to-
> gether with all tools necessary to operate the same, is exempt to such resident head
> of a family while used for the purpose of carrying on such business.

The same court, in Reeves v. Bascue (76 Kans., 333; 91 Pac.
Rep., 77), reaffirmed the last-cited case and applied the same prin-
ciple to a *portable* traction engine and lumber-sawing outfit.   The
court observed:

> The plaintiff complains and contends that the engine and other appliances for
> sawing lumber constitute a manufacturing plant and can not be classed as the neces-
> sary tools and implements of the defendant's business.   His principal business, it
> appears, is sawing timber into lumber of various dimensions and forms.   He did
> use the traction engine in thrashing for a brief time during the thrashing season, but
> the sawing of lumber appears to have been his principal occupation.   Aside from
> the traction engine, which is portable, the saws, carrier, belts, etc., are said to be such
> as can be moved in a farmer's wagon.   Were they exempt?   The statute provides
> that there shall be exempt to a resident of the State who is the head of a family "the
> necessary tools and implements of any mechanic, miner, or other person, used and
> kept in stock for the purpose of carrying on his trade or business, and in addition
> thereto stock in trade not exceeding $400 in value."   (Gen. Stats., 1901, sec. 3018,
> subd. 8.)
>
> It will be observed that the fact that the tools and implements are large and heavy
> does not take them out of the operation of the statute.   Nor is there any limit placed
> on the number, character, or value of the tools and implements protected by the
> exemption.   It is enough that they belong to the mechanic, miner, or other person,
> that they are necessary, and are personally used for the purpose of carrying on his
> trade or business.   If he uses the tools and implements in person and performs a
> considerable portion of the work himself, it would seem to be immaterial whether he
> is called a manufacturer or a mechanic.   A liberal interpretation is given to statutes
> of exemption, and following the one already placed upon this provision in Jackman
> v. Lambertson (71 Kans., 138; 80 Pac., 55), the appliances in controversy must be
> held to be exempt.

The Supreme Court of Colorado in a late case held the same opinion in Eckman *v.* Poor (38 Col., 200; 87 Pac. Rep., 1088). That court said:

"Implements" are defined in Anderson's Law Dictionary to be "things necessary to any trade, without which the work can not be performed." Stemmer *v.* Insurance Co. (33 Oreg., 65, 49 Pac., 588, 53 Pac., 498). The portable engine and boiler and the attachments are implements of trade, without which the business can not be carried on, and, as the value is not in excess of $300, we must hold that they are exempt from execution.

The philosophy of this precept, with other here pertinent observations, was well expressed by the Supreme Court of California in Estate of Klemp (119 Cal., 41), as follows:

It is clear from the evidence that the combined harvester in question is a farming utensil and an implement of husbandry, *if, indeed, that fact is not a matter of common knowledge.* It was used directly and prominently in the business of farming, and for no other purpose; and it is not contended that appellant had other implements by which he could cut, thrash, or winnow his wheat. Horserakes, gang plows, headers, thrashing machines, and combined harvesters are as clearly implements of husbandry as are hand rakes, single plows, sickles, cradles, flails, or an old-fashioned machine for winnowing. *There is no ground for excluding an implement from the operation of the statute because it is an improvement and supplants a former implement used with less effectiveness for the same purpose.* Present methods of farming, as well as conducting other kinds of business, require the use of improved machinery.

See also United States *v.* American Express Co. (6 Ct. Cust. Appls., 494; T. D. 36124).

Advancement in methods of agricultural pursuits is of the most conspicuous examples of what may well become matters of common knowledge, and as such, of judicial notice. Whoever, in this day of advanced and efficient methods of travel, journeys far from the hearthstone must observe these very pronounced improvements, which are not only necessary to keep the farmer in touch with competition but for the adequate and necessary supply of the world's urgent needs. Everyday observation also confirms, what this record tends strongly to establish at least prima facie, that slow traveling, heavy duty tractors are everywhere to a great degree supplanting the horse as motive power on the farm; that these machines by construction travel too slowly and are too heavy for hauling on the modern roadway, their construction intending them for slow travel and field work on a more yielding surface.

Of course, there are exceptional uses of these as of all implements, but exceptional or incidental use has never been held to control classification. Herein chief use is held the controlling factor—cases, infra. Common knowledge also advises us that for hauling, where speed and resistance to jarring injury are important, the motor truck is the implement of almost universal usage on the highways and in all hauling not merely incidental to the moving of agricultural equipment from one place to another of employment.

If we are to adhere to the definition of "implements" in Anderson's Law Dictionary, followed by many of the courts, that they are "things necessary to any trade, without which the work can not be performed," we must assume, from present day commonly observed and apparently necessary use of farm tractors, that they are farm "implements." That known general use demonstrates them commercially and practically necessary to the industry of the day. We are therefore of the opinion that farm tractors, chiefly used as and for agricultural purposes within said quoted paragraph as previously decided by this court, are "agricultural implements."

The inquiry presently presented, therefore, is (a) are the tractors for which these carbureters were imported chiefly used for agricultural purposes, and (b) are the imported carbureters parts *thereof* and are they equally parts of tractors chiefly so used?

The court is of the opinion that this record compels answer of both these questions in the affirmative. The pertinent testimony will be quoted.

Mr. L. A. Wilkie, of the Windsor Machine & Tool Co., Windsor, Canada, engaged in the machine and tool manufacturing business for 12 years, who manufactured these carbureters, witness for the importers, testified:

. Q. What business are they engaged in?—A. Manufacturing agricultural implements.

Q. State whether or not this carbureter in its present construction is suitable for any other use than that of agricultural implements.—A. I don't think it is; no.

Q. It is not?—A. No.

    *      *      *      *      *      *      *

Mr. BALDWIN. Why not ask him what they are used for?

Q. To your knowledge, what are these carbureters used for by the consignee?—A. They manufacture traction engines for farm purposes, the Rumley people do, and they don't use these carbureters for anything else than for these engines.

Q. (By Mr. BALDWIN). Did you ever see these carbureters actually in use?—A. Yes, sir.

Q. By whom?—A. By the Rumley people in La Porte.

    *      *      *      *      *      *      *

Q. Some traction engines are used for farm work and others are used for various other kinds of work?—A. Oh, yes.

Q. Do you know any reason why a carbureter of this exact type and size could not be put in any kind of a traction engine?—A. There is no reason why it could not be; the only thing is this, the Rumley people owning the patent on it, and being agricultural implement manufacturers, use it solely.

Q. For farm traction engines?—A. For farm purposes.

    *      *      *      *      *      *      *

Q. Could they be used to haul a wagon with potatoes to market?—A. Yes, sir.

Q. They are used for such purposes, hauling heavy loads along the road?—A. Yes.

    *      *      *      *      *      *      *

Q. Have you ever seen these carbureters in use—I won't say "in use"—used in the construction of agricultural implements at the plant at La Porte?—A. Have I seen them?

Q. Yes.—A. Yes.

Q. And they are used in the construction of agricultural implements?—A. How do you mean, used in the construction?

Q. Such engines as are generally used for farm purposes.

Mr. BALDWIN. I object to that as assuming the question in issue, which is whether or not a traction engine is an agricultural implement.

Objection overruled.

A. They are.

Mr. J. F. Bradley, now secretary and formerly assistant sales manager of the Rumley Products Co., called by the importers, testified:

Q. Now will you state from the experience which you have had in distributing tractors on which these carbureters are used, the use to which those tractors or traction engines are put in the United States?—A. They are used principally for plowing and for running thrashing machines.

Q. Have you seen them used on the farm?—A. I have.

\* \* \* \* \* \* \*

Q. Have you at various times been in touch with the entire territory of the United States?—A. In a general way I have.

Q. Have you seen these tractors used on the farm?—A. I have.

Q. In what way?—A. I have seen them used for plowing and for running thrashing machines.

Q. Do you sell them to dealers?—A. We sell them to dealers.

Q. And what kind of dealers are they that you sell to?—A. Agricultural implement dealers.

\* \* \* \* \* \* \*

Q. Well, did you ever see any of them in use for hauling things along the roads?—A. Only moving thrashing machines from one farm to another. That is the only thing.

Q. Have you ever seen them used for hauling wagons?—A. No, sir.

Q. Ever heard that they are used by the United States Army?—A. Never did.

Q. They would be suitable for hauling provisions for the Army, wouldn't they?—A. I would hardly call it suitable; no. They travel too slow.

Q. Have you ever known them to be used by contractors building roads or bridges, hauling products, or anything of that sort?—A. They have been sold in very small number.

Q. How can you be sure that that use is such a very small one?—A. Only from my own concern.

Q. Speaking from your own experience, how can you tell from your own experience that the use by contractors has been small as compared with that by farmers?—A. Because I see all the orders that are received by the company.

Q. (By General Appraiser McCLELLAND.) Did you say that you had sold 5,000 of them, or more?—A. Yes.

Q. Well, what per cent of that large number would you say went to contractors?—A. Well, I would say—impossible to say exactly; it is less than 1 per cent of them.

\* \* \* \* \* \* \*

Q. These tractors move rather slowly, don't they?—A. They do.

Q. In other words they are gotten up for power rather than speed?—A. They are gotten up primarily for plowing machines and their speed is designed for the proper speed pulling a plow, which is about 2 miles an hour.

\* \* \* \* \* \* \*

Q. (By General Appraiser McCLELLAND.) Will you tell me whether there is anything peculiar about the mechanism of this carbureter of yours which would unfit it for an ordinary engine?—A. Suitable—fit only for use on our particular engine. It can not be used in any other engine.

\* \* \* \* \* \* \*

Q. (By Mr. BALDWIN.) If there are any peculiarities in your carbureter that fit it for your engines, are they fundamental differences between those and other carbureters, or are they simply small technical differences that make it happen to fit your own particular type of carriage?—A. It is a fundamental difference.

Q. What fundamental difference?—A. Well, in the general relation of the carbureter and the engine and the method in which the fuel is taken into the cylinder after it has passed through these.

Mr. F. A. Coslet, assembling inspector of tractors employed by the Rumley Products Co., also importer's witness, testified:

Q. By (General Appraiser McCLELLAND.) Are you familiar with automobile carbureters?—A. Yes, sir.

Q. What is the difference between this official exhibit and the automobile carbureter?—A. The automobile carbureter is lifting your air out and lifting your fuel with the air. With this we bring the air in and carry the fuel down.

Q. These would not be used for automobiles at all?—A. No, sir; it can not be used at all.

Q. You are familiar, I suppose, with the different kinds of carbureters?—A. Yes, sir.

Q. Now, do you know whether or no there is anything peculiar about the construction of this carbureter that fits it only for use in an agricultural machine?—A. Yes; it is built for an oil-burning carbureter. That is because oil is cheaper than gasoline.

Q. Why is it that that can not be used in any other machine?—A. With another machine?

Q. Yes.—A. The other machine—you would have to redesign the machine; get the same boring and stroke on it we have got; the same manifold we have got. This is patent covered; they can not get it.

*       *       *       *       *       *       *

Q. (By Mr. BARNES.) Is it possible for any other engine except the Advance Rumley engine to use this carbureter?—A. No; for we have our governor values [valves?] all made here that fits our engine; our manifold fits this. So this won't fit another engine.

Q. That is all.

It requires no analysis of the foregoing excerpts from the testimony to show that these carbureters are so designed and constructed that they can only be affixed to and made parts of certain tractors, which tractors are designed, constructed, and chiefly used for plowing and thrashing—uses necessary and peculiar to the production of food and raiment for man. The importations, therefore, are parts of agricultural implements within said quoted paragraph. United States v. Boker & Co. (6 Ct. Cust. Appls., 243; T. D. 35472), United States v. American Express Co. (6 Ct. Cust. Appls., 494; T. D. 36124), Tower v. United States (7 Ct. Cust. Appls., 408; T. D. 36981), United States v. Irwin & Co. (7 Ct. Cust. Appls., 360; T. D. 36906), United States v. Ducommun Hardware Co. (7 Ct. Cust. Appls., 353; T. D. 36904).

The briefs render it appropriate to say that this decision relates only to the particular carbureters the subject of this appeal as specific articles, and does not declare that all carbureters or all carbureters of the oil-consuming class are decreed as herein concluded. It is the chief use of the particular implement of which they are an integral

part and the unfitness by design and construction of this particular part to be made a part of any other construction which is here held to control their dutiable classification. Nor does this conclusion import that all tractors, or even all farm tractors, are necessarily agricultural implements. That conclusion must depend upon what the particular record exhibits as to the use for which they are designed and in which they are necessarily to be employed.

*Reversed.*

DISSENTING OPINION.

BARBER, Judge: I feel constrained to disagree with my associates in this case.

The carbureters in question are made in Canada under Canadian patents by the Windsor Machine & Tool Works solely for the Rumley Products Co., a concern located in Laporte, Ind., which company owns the patents.

The entrant, in whose name this controversy is litigated, is a customs broker who makes entries of merchandise from Canada on behalf of the Rumley Products Co., the real importers.

At the time these importations were made, it is shown that the Rumley Co. manufactured the same carbureters in the United States. The secretary of that company was the principal witness. Throughout his testimony he refers to the carbureter as a part of a machine. He was asked, referring to the Rumley Co.:

Q. What general class do all their products fall under?—A. Well, we advertise it as farm power machinery.

Q. Do you use, in connection with your business, the term agricultural implements?—A. Not implements, no; machinery.

Q. Do you use the term——

Mr. BALDWIN. Be careful; do not lead him.

Q. What is the term you use?—A. Called agricultural machinery.

He further testified that these carbureters are used in tractors or traction engines, which engines are used principally for plowing and for running thrashing machines; that they are used for moving such machines from one farm to another; that a small number had been sold to contractors engaged in building roads or bridges, hauling products or anything of that sort; that these engines moved slowly; that they were gotten up primarily for plowing machines, their speed being designed for the proper speed of pulling a plow, which is about 2 miles an hour; that the carbureters were fit only for use on the particular engine manufactured by the Rumley Co.; that in order to use them on other engines it would be necessary to design special pipes therefor; that they would not build such other machines, and that other people could not use this carbureter because it was patented.

Another of the importers' witnesses testified that these engines were used for various purposes on the farm, to draw hay or anything,

and could be used to haul heavy loads along the road.   No evidence was introduced on behalf of the Government, and there is nothing in the importers' evidence that modifies what has just been stated.

The record establishes that these traction engines manufactured by the Rumley Co. are chiefly used on farms for the above-mentioned purposes.

Of course the real question is whether such engines are agricultural implements within the meaning of paragraph 391.   They are not eo nomine mentioned therein.   Whether or not they are "agricultural implements" depends upon the common meaning of the term, and that in turn requires investigation as to the meaning of the word "implement."

In my opinion this word in common understanding does not include or refer to such a complex machine as a traction engine. The first specific mention made of any articles embraced in paragraph 391 is in paragraph 591 of the act of 1894.   There "plows, tooth and disk harrows, harvesters, reapers, agricultural drills, and planters, mowers, horse rakes, cultivators, thrashing machines, and cotton gins" were given free entry provided the country of export imposed no import duty thereon.

In paragraphs 460 of the act of 1897 and 476 of the act of 1909, the identical articles were made dutiable, but the last-mentioned paragraph gave free entry thereto if the country of export imposed no duty thereon when the same was imported thereto from the United States.   In none of these paragraphs are they named agricultural implements.

Section 7 of the act of June 6, 1872, provided that for the term of two years, from the passage of the act and no longer, "steam plow machinery adapted to the cultivation of the soil" might be imported by any person for his own use free of duty under regulations prescribed by the Secretary of the Treasury.   G. A. 5165 (T. D. 23818) involved steam plow machinery which consisted of plows and steam engines in a knocked-down condition, the engines being used as the instrumentality to provide the power for operating the plows by means of a drum and winding gear in which a wire rope works, pulling the cutting apparatus of the plows back and forth from one engine to the other, two engines being employed in the operation of plowing.   This outfit had been entered at the port of San Francisco, was claimed to be an entirety and as such entitled to classification under paragraph 460 of the act of 1897.   The Board of General Appraisers held that the steam engines with the necessary tackle and accompaniments which constituted the power by which the plows were operated were not within the paragraph, and referred to the act of 1872 as indicating that Congress did not intend steam plow machinery to be classified thereunder.   An application to review

this decision was made to the Circuit Court of the Northern District of California and there in 1908 dismissed. (See T. D. 29106, suit 1534.) The case does not seem to be reported elsewhere than in this Treasury Decision.

I do not find any other decisions of Federal courts on these paragraphs. No claim is made that any of the eo nomine articles therein mentioned have been held by such courts to be agricultural implements.

It is entirely reasonable to say that this legislation indicates that Congress did not intend to regard engines whose function was solely to develop power to operate the things named in all these paragraphs, as entitled to the benefit therein given to the things themselves. In other words a distinction was intended to be made between the articles which performed the work and the power-producing engines which enabled its performance. The judicial action thereon is only consistent therewith.

It will be seen that the act of 1913 changed the form of the previous paragraphs by placing before the enumeration the words "agricultural implements," inserted "headers" and added "and machinery for use in the manufacture of sugar, wagons, carts, and all other agricultural implements of any kind or description, whether specifically mentioned herein or not."

I conceive there are but two grounds on which the claim for free entry may be sustained.

One is that the common meaning of the word "implements" includes traction engines; the other, that whether or not so, Congress has indicated that it used the word in that sense.

Dictionaries afford light on the question of common meaning. It is unnecessary to recite many in full. The New Standard defines implement as—

* * * An instrument used in work, especially manual work; a tool or a utensil; as, the *implements* of husbandry; the *implements* of warfare. 2 (archaic). Originally, that which supplies a need or a vacancy; any means or agent for the accomplishment of a purpose. * * * Syn.: see Tool.

Other dictionaries express the same thought in different language but all, to my mind, indicate substantially the same thing, viz, that an implement in its common use and meaning is synonymous with tool, utensil, or instrument, and relates to an article of relatively simple construction and usually of personal manipulation. See Webster's, Century, and Oxford dictionaries and Encyclopædia Britannica.

I do not find in these authorities that an engine is referred to as a tool or implement or that either of these words is commonly used as applicable to engines.

I reach the conclusion, therefore, which I think accords with common observation, that tools, instruments, or implements are the lowest

or first in rank of mechanical appliances and ordinarily, though not always, of personal manipulation. The higher complex mechanical devices are known as machines or machinery, among which are included ponderous mobile engines, such as manifestly are those in this case.

Giving to the word implement as its common meaning that which is adopted by the court wipes out this distinction and makes a complex, ponderous engine an implement.

This is going further than even the importer's principal witness was willing to do when he declined to call these engines implements but designated them as machinery, which obviously they are.

I do not doubt that in common parlance a thrashing machine, for instance, is spoken of as a machine and not as an implement, or that the general name applied to most of the machinery eo nomine referred to in the paragraph is farm machinery or agricultural machinery, and that the term "agricultural tools or implements" is used when reference is made to those of relatively simple construction, which would not, of course, include the engines here.

Has Congress indicated any intent in the statute to depart from this common meaning?

There are, of course, many things not eo nomine referred to in the paragraph that are clearly agricultural implements; the shovel, the hoe, forks, rakes, scythes, sickles, and other articles, most if not all of which would be dutiable were it not for paragraph 391. Hence there is ample scope for the operation of "all other agricultural implements" if application therefor be necessary.

The rule of ejusdem generis does not seem to be invoked; but if so, it can not sustain the importer, because not one of the articles in the paragraph which are used to till the soil, plant, harvest, or secure the crops are used for power alone as are these engines. All have something to do with the land or its products. These engines serve no different purpose except in a larger way than do the horses by which the smaller of the articles named are operated, and horses would hardly be considered implements.

By naming the various machines and machinery which are given free entry, I think it is fairly inferable that Congress understood they were not agricultural implements, and that to secure their classification as such it was necessary to name them. If it did not so understand the term, "agricultural implements" alone would have been sufficient. But assume the specific enumeration had been preceded by the words "such as," thereby clearly indicating the congressional view that in fact what were named were agricultural implements, and that is the most favorable view of the enactment to the importers, then it is by the rule of ejusdem generis, if at all, that these engines can be classified thereunder.

But that rule in such a case as this is that the general words, in this case, "all other agricultural implements of any kind and description" will be restrained to things of the same *kind* as those particularized. Alabama *v.* Montague (117 U. S. 602), Township of East Oakland *v.* Skinner (94 U. S. 255), United States *v.* Nichols (186 U. S. 298), Lewis's Sutherland Statutory Construction (422).

These engines, as in substance already indicated, are not of the *kind* particularized. Their function is different. Those named prepare the soil for seed, sow or plant the same, cultivate the soil while the crops are growing, and secure and prepare them for market or for consumption.

There remain for consideration the force and effect to be given to the cases cited in the main opinion. I do not think they are important or controlling. In each instance they are the views of State courts construing debtors' exemption statutes, of which it has often in substance been said that they must be liberally construed in favor of the poor debtor because based upon sound principles of justice and mercy. They are enacted to prevent the tools, implements, and other property, and often so therein stated, which are used in procuring a livelihood for the debtor and his family, from being taken away to satisfy his debts, thereby depriving him of the last means of support. Such statutes generally contain limitations as to value of the exempted property.

But, assuming they are to be considered in the construction of this statute, my purpose is accomplished by calling attention to the fact that courts of other States have taken a view radically different from that of the cases relied upon in the majority opinion. In Seeley *v.* Gwillim (40 Conn., 106) machinery, such as a ruling machine, cutting machine, paging machine, and small presses, were held not to be "implements of the debtor's trade." In Meyer *v.* Meyer (23 Iowa, 359; 92 Am. Dec., 432) the term "the proper tools or implements of a farmer" was held not to include a thrashing machine owned by a farmer and used to thrash his own grain and that of others for hire, chiefly the latter. In Ford *v.* Johnson and Barrett (34 N. Y.; Barbour, 364) a thrashing machine requiring 8 or 10 horses to operate it and as many men to attend and manage it was held as not within a provision for the "necessary working tools and team of the debtor." The court said, "The common understanding of these words would never embrace such a machine" and that the "word 'tool' is never applied to such a machine. No lexicographer can be found who gives such a signification or defines it in such a way that would justify its use in that sense." In Knox *v.* Chadbourne (28 Me., 160) the court held that the statute which exempted the "tools of any debtor necessary for his trade or occupation" would not include a peg machine, saying "the statute does not exempt machines." In

Henry v. Sheldon (35 Vt., 427) it was held that the word "tool" in the statute meant simple instruments ordinarily used in manual labor and did not embrace machinery or an article usually denominated a machine. Again in Allen v. Thompson (45 Vt., 472) it was held that a statute exempting "such suitable tools as are necessary for upholding life" would include a barber's chair and foot rest. In the opinion it was also said that the term "tools" related to things of simple construction and operated by direct application of manual strength. In Tucker v. Napier (225 Tex. Law Jour., vol. 1; Tex. Court Appls. Civ. Cas., vol. 1, p. 365) the statute exempted "all implements of husbandry" and all tools and apparatus belonging to any trade or profession.

The court reviewed the authorities. It said that implements of husbandry embraced the farming tools and implements of labor belonging to the farmer which are used on the farm but did not exempt a mowing machine for grass. It held that one whose business was a mower of hay was not entitled to a mowing machine as a tool belonging to his trade or profession. Batchelder v. Shapleigh (10 Me., 135) was cited, where a sawmill was held not exempt, because it was an instrument not worked by hand or muscular power.

Dainforth v. Woodward (10 Pick., 423) was also referred to, where it was held that the word tool is not understood either in its strict meaning or in the popular sense as designating complicated machinery which in order to produce any useful effect must be worked by combining distinct parts or separate pieces, the aid of more hands than one being necessary to perform the operation. Other similar cases might be cited, but the foregoing seem sufficient.

In the case of Jackman v. Lambertson (71 Kans., 138), the statute of exemption applied to things used for carrying on a trade or business, and reliance was had upon the fact that the property held exempt was used by the exemptor himself for that purpose.

In the case of In re Estate of Baldwin (71 Cal., 74), a thrashing machine with an expensive outfit was held not exempt because it was used "chiefly in doing work for others."

This ruling was followed in the case of In re McManus (67 Cal., 292).

In the case of Montague v. Richardson (63 Am. Dec., 173; 24 Conn., 338) it was said that the California code was broader than any to which attention had been called.

I think it is apparent that the California courts have given much force to the provision that thrashing machines and the like articles to be exempt under the code of that State must be chiefly used by the owner for his own farming purposes. It does not follow therefrom that a provision for agricultural implements or implements of

husbandry with no limitation as to use would be held by that court to exempt traction engines like these.

I think the weight of authority, if that class of cases be regarded as authority, is against the conclusion of the majority opinion.

In the case at bar the board, among other things, said:

The fact that one particular type of engine may prove peculiarly adaptable for hauling agricultural implements will certainly not operate to make such an engine an agricultural implement. It still remains what its internal mechanism inevitably constitutes it, a hauling engine, and its definite status as such will not be changed merely because it may prove advantageous to use the engine for some particular line of work.

And again:

Obviously, a steam engine, the functions of which are employed solely for generating steam power, can in no sense be considered an agricultural implement.

I agree with this, and the last statement is peculiarly applicable to the traction engines under consideration here. It is common knowledge that many of these traction engines are ponderous and expensive, and had Congress designed that they be regarded in the class named in paragraph 391, it would have named the same as it did the other large machines therein enumerated and not have left the question of their classification to judicial interpretation. Steam engines are specifically mentioned as dutiable under paragraph 165 of the act of 1913. Assuming a traction engine driven by steam be used as are these here, could it be said that they were agricultural implements? The results which will logically follow the holding of the majority in this case are so comprehensive and likely to bring within the scope of paragraph 391 such a great variety of ponderous and complex machinery simply because a particular design thereof is used chiefly upon a farm that I think until Congress has definitely indicated its intention that articles like traction engines are included therein, they should by the court be excluded.

I would sustain the judgment of the Board of General Appraisers.