(C. D. 642)

W. J. Byrnes & Co. *v.* United States

United States Customs Court, First Division

(Decided June 5, 1942)

*Eugene R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiffs.
*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the defendant.

Before OLIVER, WALKER, and TILSON, Judges; TILSON, J., dissenting

OLIVER, Presiding Judge: This is an action brought to recover duties claimed to have been illegally exacted on an importation of a certain chemical insecticide in tablet form.

The merchandise was assessed for duty at 6 cents per pound and 30 per centum ad valorem under paragraph 2 of the Tariff Act of 1930 as a polymer of acetaldehyde. It is known as metaldehyde. It is claimed to be free of duty under paragraph 1604 as an agricultural implement.

The case was submitted for decision on a stipulation of counsel wherein it was agreed in part that the imported merchandise was "a polymer of acetaldehyde, a chemical compound in tablet form

known as metaldehyde," and that it "was chiefly used in the United States by farmers as an insecticide for the destruction of slugs and snails which are detrimental to their vegetable and citrus fruit crops."

The two paragraphs in question, insofar as material, are as follows:

PAR. 2. Acetaldehyde * * *; homologues and polymers of all the foregoing; * * * all the foregoing not specially provided for, 6 cents per pound and 30 per centum ad valorem.

PAR. 1604. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins * * * and all other agricultural implements of any kind or description, not specially provided or, whether in whole or in parts, including repair parts: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.

There is one controlling issue in the case at bar, namely, whether or not this imported chemical in tablet form is an agricultural implement. If it is decided that it is, then, and not until then, does it become pertinent to inquire whether or not it is excluded from paragraph 1604 because of the statement therein "That no article specified by name in Title I shall be free of duty under this paragraph."

The history of litigation of paragraph 1604 and its predecessors discloses that with very few exceptions all the cases decided have been concerned not with the question of whether or not the article of merchandise before the court was an implement, but rather whether that which was admittedly an implement was chiefly used for agricultural purposes. One of the relatively few cases where the question of implements was directly involved arose in *Richardson* v. *United States* (8 Ct. Cust. Appls. 179, T. D. 37289). In that case certain carburetors were claimed to be free of duty as parts of farm tractors, and the court went rather fully into the question of whether or not a large machine such as a tractor should be properly designated as an implement. The court held that it should. The dissenting opinion of Judge Barber, after setting forth some of the dictionary definitions of the word "implement" stated what might be said to be the ordinary or commonly understood meaning of the word "implement" when he said (page 187):

Other dictionaries express the same thought in different language but all, to my mind, indicate substantially the same thing, viz, that an implement in its common use and meaning is synonymous with tool, utensil, or instrument, and relates to an article of relatively simple construction and usually of personal manipulation. See Webster's, Century, and Oxford dictionaries and Encyclopaedia Britannica.

The question of construction of the words "agricultural implements" was not again squarely presented to our appellate court until the case of *United States* v. *Perry* (25 C. C. P. A. 282, T. D. 49395). The merchandise there involved consisted of celluloid chicken leg bands. In its decision the court discussed very fully the meaning of, and the

limitations to be placed upon, the word "implement" as used in paragraph 1604, and said in part (page 286):

> * * * We think the term "implements of any kind or description" as it appears in paragraph 1604 should not be given its narrowest meaning. Frequently "implement" is regarded as being synonymous with a tool or utensil used in manual work. The term has a broader meaning which we think should be accepted in arriving at the intent of Congress in the enactment of paragraph 1604.

The court, in applying the broader meaning to which it referred, held the chicken bands there before it to be agricultural implements. Later the court followed this decision by holding steel wire bale ties to be likewise free of duty as agricultural implements (*Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. 403, C. A. D. 47).

Notwithstanding the fact that the court in the *Perry* case, *supra*, held a chicken band to be an "agricultural implement," we do not understand that by this decision the court has intended to lay down a rule that any article or thing chiefly used for agricultural purposes is to be classified as an agricultural implement. In the absence of such a holding we cannot find the merchandise at bar to be so classifiable.

No record was made in the case at bar but the stipulation on which the case was submitted informs us that the imported merchandise is a chemical compound in tablet form chiefly used by farmers, at the date of importation, as an insecticide for destruction of slugs and snails. We are not advised how these tablets are used but we will hazard a guess that they are dissolved and that the solution so formed is sprayed on the plants or trees to be protected, or is injected into the earth. The method of its preparation or use is immaterial. It is imported in the form of a tablet. We cannot envision a tablet, powder, or liquid that could by the most liberal construction of the term be called an implement. There are no authorities that we have been able to find which cover this particular point, but there are indications in the tariff act that some of the things chiefly used in agricultural pursuits were not considered by Congress to be agricultural implements but were specially provided for *eo nomine* on the free list. Paris green, one of the better known insecticides, is *eo nomine* provided for (paragraph 1737). So are such items as fertilizer (paragraph 1685), sheep dip (paragraph 1759), and manure (paragraph 1685). It would seem that none of the foregoing would be an agricultural implement. It is quite probable that the spraying equipment used in spraying an insecticide would be an agricultural implement, but not the liquid spray itself. In fact *sulphur sprayers* used in spraying trees and plants have been held to be agricultural implements (Abstract 8911), but the article so sprayed, sulphur, is specially provided for (paragraph 1777). *Soil injectors* used to inject chemicals (insecticides) into agricultural lands to rid them of insects and pests have been held to be agricultural implements (Abstract 24664), but

there is no record of the chemical so injected being of itself an agricultural implement. In like manner, a *pump* used to lift manure from a sump (Abstract 9630) and a *manure carrier* (Abstract 23401) were held to be agricultural implements, but the manure is still awaiting designation as an implement. The tank in which sheep are dipped might well be called an agricultural implement, but we submit that the liquid sheep dip in which they are immersed would not be so classified. A *fertilizer spreader* would probably be an agricultural implement, but not the fertilizer itself. The *Perry* case, *supra*, broadened considerably the scope of the term agricultural implements, but if we were to so classify the tablets in the case at bar then it would seem that lice powder, rat poison, and horse liniment should be likewise classified as implements, providing that they were chiefly used on the farm and were not specified by name in title I.

Finally we are of the belief that the doctrine of *ejusdem generis* could well be applied in the construction of the words "and all *other* agricultural implements of any kind or description found in paragraph 1604 under which the plaintiffs claim. The term *"other* agricultural implements" unquestionably was inserted in the paragraph to mean in addition to those described by name and of like use. The phrase "other agricultural implements" was undoubtedly used by the Congress to avoid a long enumeration of implements of the same general nature to those set forth in the first part of the paragraph. There would otherwise have been no need for the Congress to describe the different "implements" set forth if it had not thereby intended in enumerating some, to indicate the class of articles to be covered by the general words "all other agricultural implements." Certainly the merchandise at bar, the chemical tablet, cannot by any stretch of the imagination be said to be *ejusdem generis* with the articles named in paragraph 1604. All of the articles so named in the paragraph would, under the decisions of this Court, be classifiable as agricultural implements had they not been *eo nomine* provided for. The holding of our appellate court in the *Richardson* case, *supra*, supports this position. While the term "agricultural implements of any kind or description" as used in paragraph 1604 is very broad, its use in connection with the enumerated articles contained therein is some indication of the class of implements which Congress intended to be covered by the paragraph. It will be noted that paragraph 1604 also contains the language "whether in whole or in parts, including repair parts." While this does not convey the direct implication that all agricultural implements must be in multiple parts or that they must be mechanical units, to hold that a chemical tablet is an agricultural implement would in our judgment be stretching the word "implement" to the breaking point.

We are of opinion that the imported merchandise, a chemical insecticide in tablet form, is not an agricultural implement. It is an article or material which was on the date of importation chiefly used in agriculture and is provided for as a dutiable commodity under paragraph 2 of the Tariff Act of 1930, as a polymer of acetaldehyde. As it is our judgment that the merchandise at bar is not an agricultural implement, it is not necessary to determine whether this article is specified by name in title I, nor is it material whether the chief use of the merchandise is to be determined as of the date of the passage of the Tariff Act of 1930, or the date of importation.

In our opinion, the protest herein should be and is overruled, the classification of the collector affirmed, and judgment will be entered accordingly.

### DISSENTING OPINION

TILSON, Judge, dissenting: This case was originally specially assigned to me for the preparation of the majority opinion. After careful consideration the following was prepared by me as the majority opinion, which was rejected by my associates, and is now filed as my dissenting opinion.

This suit against the United States was filed by the plaintiffs seeking to recover certain duties claimed to have been illegally exacted upon a certain importation of chemicals designated on the invoice as metaldehyde. The collector classified the merchandise as a polymer of acetaldehyde under paragraph 2 of the act of 1930, and assessed duty thereon at the rate of 6 cents per pound and 30 per centum ad valorem. The plaintiffs claim the same to be properly free of duty under paragraph 1604 of the same act, as " * * * agricultural implements of any kind or description, not specially provided for * * *."

The case was submitted for decision upon the following stipulation:

It is hereby stipulated and agreed by and between the attorneys for the respective parties hereto—

(1) That the merchandise, the subject of this protest, is a polymer of acetaldehyde, a chemical compound in tablet form known as Metaldehyde;

(2) That as of the date of importation of said Metaldehyde, Metaldehyde was chiefly used in the United States by farmers as an insecticide for the destruction of slugs and snails which are detrimental to their vegetable and citrus fruit crops;

(3) That this use of Metaldehyde as an insecticide has only been the chief use in the United States since the early part of 1937;

(4) That as of June 17, 1930, Metaldehyde was not used at all as an insecticide in the United States;

(5) That the protest be deemed submitted on this stipulation and that the right to the first docket call and the right to amend are hereby waived.

The two competing paragraphs read as follows:

PAR. 2. Acetaldehyde, aldol or acetaldol, aldehyde, ammonia, butyraldehyde, crotonaldehyde, paracetaldehyde; ethylene chlorohydrin, propylene chlorohydrin,

butylene chlorohydrin; ethylene dichloride, propylene dichloride, butylene dichloride; ethylene oxide, propylene oxide, butylene oxide; ethylene glycol, propylene glycol, butylene glycol, and all other glycols or dihydric alcohols; monoethanolamine, diethanolamine, triethanolamine, ethylene diamine, and all other hydroxy alkyl amines and alkylene diamines; allyl alcohol, crotonyl alcohol, vinyl alcohol, and all other olefin or unsaturated alcohols; homologues and polymers of all the foregoing; ethers, esters, salts and nitrogenous compounds of any of the foregoing, whether polymerized or unpolymerized; and mixtures in chief value of any one or more of the foregoing; all the foregoing not specially provided for, 6 cents per pound and 30 per centum ad valorem.

PAR. 1604. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided*, That no article specified by name in Title I shall be free of duty under this paragraph.

In view of the proviso to said paragraph 1604 we must first determine whether or not the imported merchandise is specified by name in title I of this act, since if it is so specified there would appear to be no competition between the two paragraphs.

Paragraph 2 does not specify "Metaldehyde" by name, but it should be noted that the stipulation does not agree that the imported merchandise is "Metaldehyde," but that it is a *polymer of acetaldehyde,* known as metaldehyde. It will be noted that the paragraph specifies "polymers of all the foregoing," and included among the foregoing is "Acetaldehyde." Therefore, paragraph 2 specifies polymers of acetaldehyde. We must therefore determine whether this is a specification of the imported merchandise by name, or whether it is a provision or designation for a general class of merchandise.

In support of his contention that the provision for polymers of acetaldehyde in paragraph 2 is not a specification by name, but merely a class designation or specification, counsel for the plaintiff relies upon the case of *United States* v. *Perry,* 25 C. C. P. A. 282. In that case the appellate court was called upon to decide whether or not the provision in paragraph 31 for "all compounds of cellulose * * * made into finished * * * articles" was a specification by name or a class provision or specification. In holding that the above provision was not a specification by name, the appellate court said:

The next question to decide is whether or not the leg bands at bar are articles "specified by name in Title I" of the Tariff Act of 1930. If this question is answered in the affirmative, it follows that the merchandise is not free of duty under paragraph 1604. It will be noticed that the proviso says: "specified by name." The phrase "not specially provided for" was not depended upon by Congress, as is so frequently the case in the enactment of tariff paragraphs, to bring about the result desired. In order for it to be taken out of the agricultural implement paragraph by other provisions it was necessary that it had to be "specified by name" in some provision of title I.

To hold that the term "all compounds of cellulose * * * made into finished * * * articles" is specifying celluloid poultry leg bands by name, would, in our opinion, unduly restrict the application of the very broad phrase in paragraph 1604 "and all other agricultural implements of any kind or description." We do not think that when congress used the term "specified by name" it used it synonymously with "provided for." The term "all compounds of cellulose * * * made into finished * * * articles" is quite general in its scope. There are many different kinds of compounds and many different kinds of compounds of cellulose. To name a general class such as is done in paragraph 31, *supra*, is not to specify an article by name, within the meaning of paragraph 1604.

By the use of the plural, *polymers*, the Congress has recognized that there is more than one polymer of acetaldehyde. It is to be noted also that *polymers* is not limited or restricted to acetaldehyde, but applies equally to all the other enumerated articles in said paragraph 2, and also to "*all other* olefin or unsaturated alcohols." It will therefore be seen that in paragraph 2 we have provision for a minimum of more, and perhaps many more, than 32 polymers, allowing only 1 polymer for each of the specified articles.

In the brief of counsel for the defendant, we find the following:

It is stipulated that the importation is a polymer of acetaldehyde. Acetaldehyde is mentioned *eo nomine* in paragraph 2. It is defendant's contention that the designation polymers of acetaldehyde amounts to the same thing as an *eo nomine* designation of metaldehyde. Aldehyde synonymous with acetaldehyde is a compound intermediate between the alcohols and other corresponding acids. The presence of mere traces of impurity causes aldehyde gradually to convert into a polymer. Allen's Commercial Organic Analysis, Vol. I, p. 253. Metaldehyde is therefore simply a polymeric form of acetaldehyde.

It will be observed the appellate court did not hold in the *Perry* case, *supra*, the phrase "specified by name" to be that which "amounts to the same thing as an *eo nomine* designation." If, as contended by counsel for the defendant, the provision for polymers of acetaldehyde is a specification by name, then the argument that such provision "amounts to the same thing as an *eo nomine* designation" would appear to be unnecessary. The argument of counsel for the defendant might well be construed as an admission on his part that the provision for polymers of acetaldehyde is not a specification by name. To accept this argument as sound would be to rewrite the proviso to paragraph 1604 as follows:

Provided: That no article the specification of which in Title I amounts to the same thing as an *en nomine* designation shall be free of duty under this paragraph.

The answer to this argument is that the Congress did not so write the paragraph, and we are not at liberty to construe it as though it had been thus written.

The foregoing observations are based upon the premise that the merchandise is a polymer of acetaldehyde. However, if the imported merchandise should be held to be metaldehyde, rather than a polymer

of acetaldehyde, known as metaldehyde, then clearly there is no provision for metaldehyde, or for an article known as metaldehyde, contained in said paragraph 2.

Webster's New International Dictionary defines polymer as follows:

*polymer.* \* \* \* Chem. Any of two or more substances interrelated by polymerism; specif., a substance produced from another by polymerization.

The same authority defines polymeric and polymerization as follows:

*polymeric.* \* \* \* Chem. Of the same elements in the same proportions by weight, but having different molecular weights; thus, cyanic acid (CNOH), fulminic acid ($C_2N_2O_2H_2$), and cyanuric acid ($C_3N_3O_3H_3$), are *polymeric* with each other. Cf. ISOMERIC, 1.

*polymerization.* Chem. Act or process of changing to a polymeric form of higher molecular weight, as in the formation of paraldehyde from aldehyde; the state resulting from such change.

According to the definition of polymer, as given above, the provision in paragraph 2, so far as here involved, would read "Any of two or more substances interrelated by polymerism" of acetaldehyde.

It is clear to me and I so hold that the provision for polymers of acetaldehyde in paragraph 2 is a class designation and does not specify the imported merchandise by name. Therefore, the proviso to said paragraph 1604 has no application to the merchandise in this case.

Counsel for the defendant cites the case of *United States* v. *Sheepshearers*, 20 C. C. P. A. 327, and the following comment thereon is found in his brief filed herein:

There is some degree of latitude to be indulged in deciding whether an article is mentioned by name in the dutiable list so as to take it out of paragraph 1604. *United States* v. *Sheepshearers Mdse. & Comm. Co.*, 20 C. C. P. A., 327, involved a comb and cutter, both used for shearing sheep. It was held that they were in fact blades for animal clippers, although the proof indicated that no such name as blades for animal clippers was used in commerce. It could have been held that the term blades for animal clippers was a class designation, but it was held that the imported combs and cutters did not qualify under the agricultural implements paragraph, because the term in question designated them by name.

    \*       \*       \*       \*       \*       \*       \*

At no place in the *Sheepshearers* case, *supra,* did counsel for the plaintiffs contend that "blades for animal clippers" was a class designation. The entire case turned on the question of commercial designation. The court below considered the proof of commercial designation sufficient, but the appellate court took a different view of the evidence, and therefore reversed the judgment of the lower court.

In the case at bar, metaldehyde is nowhere mentioned by name in title I of the act of 1930, and counsel for the plaintiffs has clearly demonstrated that the chemical compounds specified by name in paragraph 2 may give rise by polymerization to a number of sub-

stances that are not the same, but different from the original compound, and that acetaldehyde, one of the chemical compounds specified by name in paragraph 2, has produced, not alone the polymer metaldehyde, but several others which he mentions, and to which counsel for the defendant has added another.

Counsel for the plaintiffs therefore contends that the stipulation that metaldehyde is a polymer of acetaldehyde has no other effect than to concede that metaldehyde is one of a class of substances designated in paragraph 2, as polymers of the foregoing. The contention of counsel for the defendant that a polymer is merely a combination of a chemical compound with itself, and is the same thing as the original compound, is negatived by the definition of "polymer" on which he relies, because if, as the definition states, a polymer is "a substance produced from another" it cannot be the same because it is "another."

I now come to the question of whether or not a polymer of acetaldehyde, or metaldehyde, is an agricultural implement of any kind or description, not specially provided for, as provided for in paragraph 1604. On this phase of the case it has been stipulated:

That as of the date of importation of said Metaldehyde, Metaldehyde was chiefly used in the United States by farmers as an insecticide for the destruction of slugs and snails which are detrimental to their vegetable and citrus fruit crops.

That this use of Metaldehyde as an insecticide has only been the chief use in the United States since the early part of 1937;

That as of June 17, 1930, Metaldehyde was not used at all as an insecticide in the United States.

Counsel for the plaintiffs in his brief filed herein contends that the imported merchandise is an agricultural implement within the meaning of that term in paragraph 1604, because since the early part of 1937 and as of the date of importation the merchandise has been chiefly used in the United States by farmers as an insecticide in the destruction of slugs and snails which are detrimental to the vegetable and citrus fruit crops, and that this use, which is the chief use, is clearly agricultural. In support of this contention he cites a number of decisions wherein it was held that articles and commodities were free of duty under paragraph 1604, such decisions being based upon an ever-widening interpretation of the terms "implements" and "agricultural." The most recent decision on what constitutes agricultural implements appears to be the *Perry* case, *supra*. In that case the appellate court stated:

The Government strenuously argues that the celluloid poultry leg bands are not implements irrespective of their agricultural character. We think the term "implements of any kind or description" as it appears in paragraph 1604 should not be given its narrowest meaning. Frequently, "implement" is regarded as being synonymous with a tool or utensil used in manual work. The term has a broader meaning which we think should be accepted in arriving at the intent of

Congress in the enactment of paragraph 1604. We quote several definitions of the noun "implement" from Webster's New International Dictionary:

*implement.* 1. That which fulfills or supplies a want or use; esp., an instrument, tool, or utensil used by man to accomplish a given work; as, the *implements* of trade, of husbandry, or of war.

2. A constituent part; an element.  *Obs. & R.*

3. *Scots Law.*  Fulfillment, performance.

Syn. *implement, tool, utensil, instrument* agree in suggesting relatively simple construction and personal manipulation. *Implement* and *tool* are often interchangeable. But *implement* is the broader term, frequently implying that by which any operation is carried on: *tool* commonly suggests the implements of a craftsman or laborer;  *  *  *

, In the case of *United States* v. *Magnon*, 71 Fed. 293, Judge Lacombe, speaking for the Circuit Court of Appeals, Second Circuit, holding snakes to be free of duty as instruments of trade, rather than dutiable as live animals, observed:

*  *  *  It is no doubt true that we usually associate the word "instrument" with inanimate objects, but that is no reason why the word, when used in a tariff act, should not be given its comprehensive meaning when there is nothing to indicate an intention to restrict such meaning. It is no more surprising to find iive animals referred to in such a statute as "instruments" than it is to find them referred to as "articles."

In the case of *United States* v. *Boker*, 6 Ct. Cust. Appls., 243, the appellate court held that the "effect and office" of the provision "all other agricultural implements of any kind and description *  *  *  " " *  *  *  is to exhaust everything within that literal confinement." In the language of paragraph 1604 there is not only nothing to indicate an intention to restrict the meaning of the words "agricultural implements" but the words immediately following, "of any kind or description," clearly indicate a congressional intention "to exhaust everything within that literal confinement." ·

Giving to the term "agricultural implements of any kind or description," its broader meaning which I think should be accepted in arriving at the intent of the Congress in the enactment of paragraph 1604, and following the authorities, as hereinbefore set out and referred to, I hold the merchandise in this case, polymers of acetaldehyde known as metaldehyde, to be an agricultural implement within the meaning of paragraph 1604.

The only remaining question is whether its chief use must be determined as of the date of the passage of the Tariff Act of 1930, or at or immediately prior to the date of the present importation. The answer to this question was given by Judge Lacombe, speaking for the Circuit Court of Appeals, Second Circuit, in *United States* v. *Roessler & Hasslacher Chemical Co.*, 79 Fed. 313, in the following language:

*  *  *  When words used in a tariff act have some peculiar trade meaning, it must, of course be assumed that congress used them with the meaning they had when they were inserted in the act, not with some new meaning acquired afterwards;  · and therefore in such cases the only competent estimony is such as tends to prove

what that meaning was when congress used the words. But this principle does not apply when an article of importation is to be classified according to its use, when the question is whether it shall be included within a descriptive phrase, which differentiates what it describes from all other articles, not by a commercial or common name or by component materials, but by the use to which the article is put. When congress provided, in October, 1890, that "medicinal preparations" should pay 25 per cent., it certainly did not mean that an article which was not then used in medicine should continue to be classified as not within this paragraph, although, two years after the act was passed, its sole use had come to be medicinal; nor that an article used solely as a medicine when the act was passed should continue within this paragraph after all such use might cease. What the paragraph does cover is all articles not otherwise specially provided for whose chief use (if not their sole one) is medicinal, and this question of use is to be determined as of the time of importation.

In the case of *United States* v. *Boker*, 6 Ct. Cust. Appls., 243, in construing paragraph 391 of the act of 1913, which, in all respects material here, is the same as paragraph 1604, the appellate court stated:

All these considerations imply and necessitate that the use of the implement must determine its classification whether or not an agricultural implement within the paragraph, and that that use, and the determinative fact, is chief use.

As recently as January 4, 1940, in *Lake* v. *United States*, 27 C. C. P. A., 247, the appellate court restated the rule as to use, quite in harmony with the rule as stated by Judge Lacombe in the *Roessler* case, *supra*, as follows:

It is well established that where the statute provides that the thing designated shall be classified under a given provision only if chiefly used for a specified purpose, use must be determined as of the date of the importation of the particular merchandise involved, or immediately prior thereto, while the common or commercial meaning of an *eo nomine* designation in a tariff act must be determined as of the effective date of that act. * * *

Whether the Congress uses the words "chief use" or merely the word "use" or leaves "use" to be inferred, as in paragraph 1604, it could not have been ignorant of the fact that "chief use" was the one and only factor which could and would finally control and determine the classification of merchandise subject to such provisions. The Congress could never have intended to permit merchandise to enter our commerce free of duty simply because on the date of the passage of the act under which it was entered, perhaps 15 years previous, the use to which the merchandise was then put entitled it to free entry, when as a matter of fact the use and chief use of the merchandise when entered made it dutiable beyond question. This, irrespective of whether the act employed the words "chief use," "use" only, or left "use" to be inferred, as in paragraph 1604. The reverse of this proposition is equally true.

It is not my view that the Congress, in the enactment of paragraph 1604 of the act of 1930, intended that the farmer should, in 1940, be required to pay a duty of 30 per centum ad valorem and 6 cents per

pound on the imported merchandise simply because he had not in 1930 and immediately prior thereto discovered the usefulness of this merchandise in destroying pests that prey upon his agricultural crops. Neither is it my view that Congress ever intended that merchandise which, according to its use and chief use, was free of duty in 1930, should continue to be free of duty in 1940 at which time it had acquired a new use and chief use which made it dutiable, and had completely lost the use and chief use it had in 1930.

In the present case, as in the *Boker* case, *supra*, it must be held that the use of the implement must determine its classification whether or not an agricultural implement within the meaning of paragraph 1604, and that that use, and the determinative fact, is chief use. In view of the fact that chief use is determinative of whether or not the instant merchandise is an agricultural implement under paragraph 1604, the use must be determined as of the date of the importation of the particular merchandise involved, or immediately prior thereto.

It should be remembered that I am not here applying the rule of chief use as of the date of the importation of the particular merchandise involved, or immediately prior thereto, for the purpose of determining whether the involved merchandise under the common or commercial meaning of polymers of acetaldehyde is dutiable under paragraph 2. I am, however, applying the rule for the purpose of determining whether the date of the passage of the act or the date of importation of the merchandise controls when the merchandise is chiefly used for agricultural purposes.

Since I did not have the advantage of the views now expressed by my associates when I prepared the foregoing, I wish to make a few observations concerning the views expressed in the majority opinion. The weakness of the position of my associates in holding the imported merchandise not to be an implement appears to be revealed when they found it necessary to refer to and rely upon a dissenting opinion, which, of course, is not the law, to support their position. I refer to their quotation from the dissenting opinion of Judge Barber in the *Richardson* case, *supra*.

From a reading of the stipulation, hereinbefore quoted, it appears to me that we are definitely "advised how these tablets are used," and there appears to me to be no reason for hazarding a guess as to how they are used. So far as the question here presented is concerned, we are bound by the stipulation, and it is absolutely immaterial whether the merchandise is used in the condition in which imported, or whether it is dissolved and the solution sprayed on plants or injected into the earth. The hazarding of a guess as to how this merchandise is used serves only as a springboard from which my associates jump to the conclusion that the articles used to spray the solution on

plants or inject it into the earth might be considered implements, but that the merchandise itself could not be considered an implement. In my opinion, this again discloses the weakness of the position taken by my associates.

Finally my associates arrive at the point where they have to rely upon the doctrine of *ejusdem generis*. The citation of authorities by my associates to support their reasoning on this point are conspicuous by their complete absence. In my opinion, the doctrine of *ejusdem generis* has no application where, as here, the classification of the merchandise is made to depend upon "use." It has been many times held by the appellate court that an *eo nomine* provision cannot prevail as against the doctrine of chief use. *Factor v. United States*, 15 Ct. Cust. Appls. 401; *United States v. Belgam Corp.*, 22 C. C. P. A. 402.

The doctrine of *ejusdem generis* finally relied upon by my associates does not appear to find any support in the case of *United States v. Perry*, 25 C. C. P. A. 282. In that case the merchandise consisted of celluloid poultry leg bands, and since my associates rely upon the doctrine of *ejusdem generis*, it is worthy of note that they fail to point out whether they consider celluloid poultry leg bands *ejusdem generis* with plows, tooth or disc harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts, or cream separators. Yet the appellate court held these celluloid poultry leg bands to be properly dutiable as agricultural implements.

An instance wherein the word implement is used to cover merchandise apparently very similar to that in question is found in the Neutrality Act of 1939, U. S. C., title 22, wherein the Presidential Proclamation No. 22 of May 1, 1937 was retained in force. Among the articles therein defined as arms, ammunition, and *implements* of war in category VI, are some twenty-one chemicals which appear to be of the class ordinarily known as poison gases. It would seem that if poison gases are considered as *implements* of war, by the same logic poison tablets might well be considered implements of agriculture. One is used to kill and destroy human beings and the other is used to kill and destroy slugs and snails.

For the reasons stated and following the authorities cited and quoted, I adhere to my original decision, and hold that the merchandise covered by this suit which was assessed with duty at 30 per centum ad valorem and 6 cents per pound under paragraph 2, as polymers of acetaldehyde, not specially provided for, should be held free of duty under paragraph 1604, as agricultural implements of any kind or description, not specially provided for, as claimed by the plaintiffs.