COLUMBIA SHIPBUILDING CO. ET AL. *v.* UNITED STATES (No. 2138).[1]

ENTIRETIES—ENGINES AND FANS.
- Steam engines and fans, designed to be operated together for supplying forced draft to boilers of vessels, each engine and fan being complete in itself and capable, by minor alterations in the couplings, of being used separately, should not have been treated as entireties and assessed as miscellaneous manufactures of metal under paragraph 167, tariff act of 1913.   The claim of the protest for segregation and assessment of the engines eo nomine under paragraph 165 should have been sustained by the Board of United States General Appraisers.

United States Court of Customs Appeals, March 31, 1922.

APPEAL from Board of United States General Appraisers, Abstract 44417.

[Modified.]

*Comstock & Washburn* (*J. Stuart Tompkins* of counsel) for appellant.
*William W. Hoppin,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

[Oral argument February 24, 1922, by Mr. Tompkins and Mr. Hoppin.]

Before SMITH, BARBER, and MARTIN, Associate Judges; DE VRIES, Presiding Judge, participating in the decision by agreement of counsel.

MARTIN, Judge, delivered the opinion of the court:

The merchandise involved in this case consisted of certain steam engines and Howden fans or blowers, which were designed to be operated together for supplying a forced draft to the boilers of vessels.

The articles were classified for duty as entireties and were assessed as such at the rate of 20 per cent ad valorem, under the general provision for manufactures of metal contained in paragraph 167 of the tariff act of 1913.

[1] T. D. 39085.

The importers protested against the assessment, presenting two alternative claims in the protest, first claiming free entry for the merchandise as materials or articles for the construction or repair of vessels under subsections 5 and 6, paragraph J, Section IV of the act; and, second, claiming that if not entitled to free entry as aforesaid the merchandise should nevertheless be segregated for duty and the steam engines should be assessed at the rate of only 15 per cent ad valorem under the eo nomine provision for "all steam engines" in paragraph 165 of the act.

The protest was submitted upon evidence to the Board of General Appraisers, and was overruled as to both of its claims. This appeal was taken from that decision.

The importers now abandon their claim for free entry of the merchandise, and they no longer contest the assessment of 20 per cent ad valorem levied upon the fans. But they insist, however, upon their claim that the steam engines should be classified separately for duty, and assessed at only 15 per cent ad valorem under the eo nomine provision for "all steam engines," contained in paragraph 165 of the act. It may be repeated that the engines and the fans, although invoiced separately, were assessed together at the rate of 20 per cent ad valorem under the provision for manufactures of metal in paragraph 167. And it is obvious that this assessment depends upon the assumption that the steam engines and fans in question were entireties when imported, for otherwise the engines would plainly fall within the eo nomine enumeration of paragraph 165 and be dutiable at 15 per cent ad valorem.

The competing paragraphs read in part as follows:

165. All steam engines, steam locomotives, printing presses, and machine tools, 15 per centum ad valorem; * * *.

167. Articles or wares not specially provided for in this section; * * *; if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with gold or silver, and whether partly or wholly manufactured, 20 per centum ad valorem.

The steam engines and Howden fans in question were not connected together in any manner at the time of importation. When in use they are coupled together, and serve an auxiliary purpose in connection with the main boiler of the vessel. The fan is equipped with a rotating shaft which carries impellers by means of which a draft of air is forced first through a heating chamber and then through the fire box of the boiler. This operation tends, of course, toward economy and efficiency in the combustion of fuel. The fan is upright in form, and when in use is fastened securely to the vessel floor. The power which rotates the fan shaft is transmitted to it by means of the steam engine in question. This is a vertical engine of ordinary type, with cylinder, piston, and rotating shaft. It has no boiler of its own, but is supplied with steam through a tube connecting with

the main boiler of the vessel. The engine is fastened to the floor near enough to the fan to leave only a clearance of three-eighths of an inch between the respective shaft ends, and these are so constructed that they may readily be connected by means of a coupling and four removable bolts. It is common practice to install a second engine of the same kind in the same manner upon the opposite side of a fan, the shaft ends thereof being similarly in juxtaposition, in order that either engine may be put in service for the operation of the fan in case the other is out of commission for any reason.

Both the engines and fans are constructed in different sizes, and in general the size of an engine has a direct relation to the size of the fan which is driven by it. But this practice is not invariable, for a large engine may operate a small fan, or vice versa, to meet the requirements of available ship space.

The engine and fan are not connected together in any other manner when in use; and they may easily and readily be disconnected by merely removing the temporary bolts and coupling. The engines are capable of use for other purposes, and the fans may be operated by other means of propulsion, although minor alterations would be required in such cases. Each engine is complete within itself as a steam engine, and each fan is complete within itself as a blower fan. The engines range in price from £130 to £386 according to size, and the fans similarly from £148 to £257.

With this description of the articles before us, we conclude that the engines and fans as imported were not entireties, notwithstanding the fact that they were designed to be operated together; for when the articles are installed for use each retains its own name and essential character, and neither one becomes in fact a part of the other. Nor do they then merge or unite so as to form together a new or distinct article having a different name or character. When in use the engine simply performs the function of an engine and retains its name as such, and the fan performs the function of a fan only and retains its separate name also.

It seems clear, therefore, that the engines in question were dutiable under the eo nomine provision for all "steam engines," contained in paragraph 165. A steam engine may be used to operate a pump, a saw, a lathe, or other machinery, and it may transmit power by means of a belt or a power shaft, or by means of a temporary coupling, as in the present case, but so long as it retains its essential characteristics and maintains its separate name and identity as a steam engine it may claim classification for duty as such under the provision in question. And this applies to the engine now in question, for it does the work of a steam engine only, and no reason appears for excluding it from the comprehensive enumeration of "*all* steam engines" in paragraph 165.

Articles similar to these were before the court in the case of United States v. Carlin (10 Ct. Cust. Appls. 83; T. D. 38356) and United States v. Reid & Co., id. 85; T. D. 38357). The issue in those cases, however, was restricted to a single claim made by the importers, to wit, a demand for free entry for the articles as shipbuilding articles or materials under subsections 5 and 6 aforesaid, upon which issue judgment went against the importers. The present issue, therefore, was not involved in either of those cases. It is interesting, however, to note incidentally, that the Carlin case involved five several protests, each covering importations of steam engines and Howden fans similar to these, and that in four of them the engines were classified and assessed with duty at 15 per cent ad valorem as steam engines under the eo nomine provision therefor in paragraph 165, the fans at the same time being assessed as manufactures of metal under paragraph 167. The merchandise covered by the fifth Carlin protest, likewise composed of Howden fans and steam engines, was assessed at 20 per cent ad valorem under the general provision for manufactures of metal under paragraph 167. The merchandise involved in the Reid case consisted of Sheldon blowers and steam engines which were neither invoiced nor entered separately and which accordingly were assessed together at 20 per cent ad valorem as manufactures of metal under paragraph 167. The protest claimed free entry for the engines as American goods returned, under paragraph 404 of the act. Since the present issue was not presented in the foregoing cases they can not serve as precedents in the instant case. Nevertheless it is interesting to note that in the case of four of those importations the steam engines were separately assessed with duty as such, which assessment was affirmed by the judgment entry in the case, and that in the other two instances conditions which bore no relation to the present question effectually prevented such an assessment.

In accordance with the foregoing views the decision of the board is modified, being reversed in so far as it relates to the assessment of the steam engines in question, and being otherwise affirmed; and the case is remanded.

*Modified.*