(C. D. 1358)

I. C. HARRIS *v.* UNITED STATES

United States Customs Court, Second Division

(Decided August 10, 1951)

*John C. Ray* for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Richard H. Welsh,* special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The importation in controversy consists of the the following:

(1) Two spherical 625-liter liquid-oxygen tanks, which were classified by the collector of customs as articles in chief value of metal and subjected to duty at the rate of 22½ per centum ad valorem, as provided in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, effective January 1, 1948.

(2) One 15,000-liter oxygen tank, which was classified as a cylindrical tank for holding gas and subjected to duty at the rate of 25 per centum ad valorem, as provided in paragraph 328 of said act (19 U. S. C. § 1001, par. 328).

Plaintiff contends that all of said tanks should be classified as parts of machines, not specially provided for, in accordance with the terms of paragraph 372 of said act (19 U. S. C. § 1001, par. 372), as modified by said General Agreement on Tariffs and Trade, and subjected to duty at the rate of 15 per centum ad valorem.

The pertinent provisions of the statutes are as follows:

Classification of the 15,000-liter tank:

PAR. 328. * * * cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty; * * * 25 per centum ad valorem; * * *

Classification of the two 625-liter tanks (paragraph 397, as modified by T. D. 51802, *supra*):

Articles or wares not specially provided for, whether partly or wholly manufactured:

   *       *       *       *       *       *       *

  Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or

silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*      \*      \*      \*      \*      \*      \*

Other  \*  \*  \*_____ 22½% ad val.

Paragraph 372 of said act, as modified by T. D. 51802, *supra*, relied upon by plaintiff, reads:

Machines, finished or unfinished, not specially provided for:

\*      \*      \*      \*      \*      \*      \*

Other (except wrapping and packaging machines;      15%, ad val.
food grinding or cutting machines; machines
for determining the strength of materials or
articles in tension, compression, torsion, or
shear; machines for making paper pulp or
paper; machines for manufacturing chocolate
or confectionery; and internal-combustion
engines).

Parts, not specially provided for, wholly or in chief value of metal or porcelain, of articles provided for in any item 372 of this Part:

\*      \*      \*      \*      \*      \*      \*

Other_____ The same rate of duty as
the articles of which
they are parts.

Mr. Everett E. Robertson, the sole witness in the case, was called on behalf of the plaintiff. He testified that since 1932 he had been employed as superintendent of the actual importer, the Enos Coal Company, LOX plant, having supervision over the maintenance and operation of the entire plant; that LOX is an abbreviation for "liquid oxygen plant"; that "it is really liquid oxygen exploded plant"; that prior to 1932 he was superintendent of the Air Reduction Sales Company, dealing with oxygen; and that he designed the oxygen tanks involved in this proceeding.

The witness then described a liquid-oxygen plant as "\* \* \* a complex mechanical apparatus or machine designed solely for the production of liquid oxygen. It has no other use at all."

In explaining how this plant produces liquid oxygen, Mr. Robertson testified:

It produces it by the use of a combined amount of equipment. In other words, it uses electric and air motors; it uses air compressors and pumps; it uses cleaning equipments such as decarbonizers, desiccators, oil separators, in the actual production of the liquid; it uses a rectification column, which includes a liquefier, a heat exchanger, and when once produced is required some form of collection which, in this case, is two 625 liter collection tanks and one large 15,000 liter oxygen tank or utility tank or an accumulation tank or whatever title you want to give it.

Q. How is this plant mechanized? How does this air——A. By the use of these combined apparatus and the use and application of energy and force as

provided by compressed and expanded air, the temperature of the air volume being handled at a certain spot in the machine's operation, namely, the column, the temperature is reduced enough under certain maintained pressure that the air is turned to a liquid or liquid air. Now, that is not the product that we are after so we continue with more intensified rectification of this liquid and control of the temperatures needed to separate the nitrogen and the oxygen. The nitrogen is maintained in liquid form for a certain period of time and then allowed to regasify and escape to the air. The oxygen, which is possibly of interest, has to be maintained at 180 degrees centigrade or 295 degrees Fahrenheit below zero at all times. It is maintained—it is produced and maintained in liquid state where it is allowed to accumulate in these collection and accumulation tanks which completes the cycle or the process of produced and usable liquid oxygen.

It appears that the use of liquid oxygen at the LOX plant is to combine it with some form of absorbent, such as ground-up charcoal or burned wood, which unites with the oxygen to form a commercial explosive "known as LOX or liquid oxygen explosive." It is used in coal mines to blast the overburden, which is described as—

Rock and dirt; probably up as high as seventy feet of overburden we move with our shovels. That is drilled horizontally and vertically and shot or broken up with the combined use of this charcoal and oxygen.

The witness also testified that in trying to reach a 5-foot vein of soft coal—

We may reach as low as three and as high as seventy but it averages five feet. We move an average of sixty feet of overburden to obtain the coal from a five foot vein.

The witness identified exhibit 1 as a so-called flow sheet which depicts the liquid-oxygen plant of the importing company, including the 625-liter tanks and the 15,000-liter tank in controversy, with the explanation that the 15,000-liter tank is located in a building about 135 feet away from the plant; that the 15,000-liter tank is illustrated in the print received in evidence as exhibit 2; and that exhibit 3 is a print of the 625-liter collection tanks.

The witness Robertson, with the use of exhibit 1, described the operation of the liquid-oxygen plant, tracing the progress or flow of air through the device until its conversion to liquid oxygen, and indicated passage of the liquid oxygen into the two 625-liter tanks and from those tanks into the 15,000-liter tank.

It is not disputed that the 625-liter tanks are the primary receptacles for the liquid oxygen and, when filled, are emptied into the 15,000-liter tank for accumulation. This tank is also used for the accumulation of liquid oxygen to be used by other apparatus. The tanks are specially designed and constructed for the importing company, and, due to the peculiar nature of liquid oxygen, special equipment is required to maintain a temperature of approximately 300 degrees below zero, as "The liquid isn't something that can be produced and put in a

can and set back in the corner, it has to be used practically as it is produced. That is its one weakness both in production and in its use in the field."

It is the contention of the plaintiff that the three tanks here in question are integral, component, and designed parts of a liquid-oxygen production machine and should, therefore, be classified as parts of a machine, not specially provided for, and dutiable at 15 per centum ad valorem, as provided in paragraph 372, as modified, *supra.*

In support of his contention that the oxygen-producing plant is a machine and that the three tanks are parts thereof, plaintiff invites our attention to the following cases: *Simon, Buhler & Baumann (Inc.)* v. *United States,* 8 Ct. Cust. Appls. 273, T. D. 37537; *United States* v. *Race Co.,* 22 C. C. P. A. (Customs) 327, T. D. 47362; *Cribari & Sons* v. *United States,* 13 Cust. Ct. 81, C. D. 874; *Hoffmann-LaRoche, Inc.* v. *United States,* 11 Cust. Ct. 82, C. D. 800; *United States* v. *Sheldon & Co.,* 15 Ct. Cust. Appls. 308, T. D. 42484; *United States* v. *Van Bourgondien Bros.,* 16 Ct. Cust. Appls. 420, T. D. 43135; and *United States* v. *Willoughby Camera Stores, Inc.,* 21 C. C. P. A. (Customs) 322, T. D. 46851.

The evidence clearly establishes that the liquid-oxygen plant employs electric and air motors, compressors, pumps, decarbonizers, desiccators, oil separators, and other apparatus by means of which through the application of energy or force liquid oxygen is produced. Counsel for defendant in its brief states, in part, "It would therefore seem that said liquid oxygen plant is a machine in a tariff sense, citing *United States* v. *Sheldon,* 15 Ct. Cust. Appls. 308, T. D. 42484; *United States* v. *Van Bourgondien Bros.,* 16 Ct. Cust. Appls. 420, T. D. 43135."

Assuming, without deciding, that the liquid-oxygen plant is a machine, the question for our determination is whether or not the three tanks above referred to are parts of the liquid-oxygen-producing apparatus. Upon this phase of the case, both parties to this litigation recognize *United States* v. *Willoughby Camera Stores, Inc., supra,* as the leading authority. In holding that tripods which may be used as supports for cameras were not for that reason integral, constitutent, or component parts of such cameras, it was stated by the court:

> * * * The most that can be said is that the two articles—a tripod and a camera—are designed to be used together, one as a support for the other, and that they are chiefly so used.

In arriving at its conclusion, the appellate court gave expression to the following views:

> It is a well-established rule that a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article.* [Italics quoted.] [Citing cases.]

The court further remarked in that case:

The mere fact that two articles are designed and constructed to be used together, does not necessarily make either a part of the other. *Columbia Shipping Co. et al.* v. *United States,* 11 Ct. Cust. Appls. 281, T. D. 39085; *United States* v. *Kalter Mercantile Co. et al.,* 11 Ct. Cust. Appls. 540, T. D. 39680.

In the case before us, the evidence establishes that the two 625-liter tanks are utilized as the primary containers of the liquid oxygen after it has been produced by the apparatus designed for that purpose, and that as said tanks are filled, their contents are gradually transferred to the 15,000-liter tank, which occupies a separate building some 135 feet from the plant. Its remoteness from the other tanks is stated to be required by Indiana State law for reasons of safety, due to the volatile and explosive nature of the liquid oxygen. Applying the reasoning above expressed in the *Willoughby* case, the mere fact that the tanks and the oxygen plant are designed and constructed to be used together does not necessarily make either a part of the other.

The situation here is not unlike that in *Columbia Shipbuilding Co. et al.* v. *United States,* 11 Ct. Cust. Appls. 281, T. D. 39085, cited in the *Willoughby* case, *supra,* wherein certain steam engines and fans, designed to be operated together for supplying forced draft to boilers of vessels, each engine and fan being complete in itself, were held not to be subject to classification as entireties. It appears, moreover, from the opinion of the court in that case that—

\* \* \* The engines are capable of use for other purposes, and the fans may be operated by other means of propulsion, although minor alterations would be required in such cases. \* \* \*

In the case at bar, it appears that the 15,000-liter tank serves as a maintenance tank for more than one liquid-oxygen-producing plant.

In *United States* v. *Janson Co.,* 16 Ct. Cust. Appls. 315, T. D. 43075, it was held that certain glass insulators used on outside radio antennae were not parts of machines, although recognizing that radios are machines. In its opinion therein, after citing various authorities, the appellate court stated:

These cases, and the reasoning thereof, we believe, point out the rule for a decision of the case at bar. These glass insulators are merely a part of the power plant, a separate entity, which supplies energy to the machine. The antenna performs much the same function as a separately built steam plant does to a steam engine which utilizes its power, or a central station which generates and furnishes the electric power for the operation of telephone instruments or electric motors. No one would contend that these separate power units were parts of the machines in question, but they are as much so as the outside antennae in question are a part of the radio receiving sets which they serve. The steam engine will not operate without steam; the sewing machine will not operate without power; the threshing separator will not function without some kind of applied power; but they are nevertheless, complete machines. This is likewise

true with a radio receiving set. It matters not if the electric impulses which come from the surrounding space are faint and well-nigh imperceptible. They constitute, nevertheless, energy and force and are the power without which the radio receiving set will not function.

We are clearly of the opinion, therefore, that a liquid-oxygen plant is an apparatus which produces liquid oxygen and fully performs its function before the tanks are brought into operation. The mere fact that the two 625-liter tanks are primary receptacles for the liquid oxygen which flows from the plant, and that the 15,000-liter tank serves to maintain the product, even though they are specially constructed and specially insulated, does not make them in a legal sense parts of the mechanism that produces the liquid oxygen.

For the foregoing reasons, the protest is overruled and the decision of the collector of customs affirmed.

Judgment will be entered accordingly.