(C. D. 1429)

GEO. S. BUSH & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 11, 1952)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* and *Lawrence A. Harper* of counsel) for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Arthur R. Martoccia*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: The collector of customs at the port of Seattle, Wash., had before him for classification four so-called Model F gasoline-driven power saws, which were imported in a knocked-down condition, together with an assortment of repair and replacement parts for various other Model F power saws. His determination that the merchandise in question consisted of machines, not specially provided for, and parts thereof, resulted in the assessment of duty at the rate of 27½ per centum ad valorem pursuant to the provisions of paragraph 372 of the Tariff Act of 1930.

Two separate protests, which were consolidated in this suit, were filed against that decision of the collector. Although several claims were made in each of the protests, the only ones relied upon by plaintiff were that the engines in each of the four complete power saws were separately dutiable at the rate of 17½ per centum ad valorem, as internal combustion engines of the carburetor type, such as are provided for in paragraph 372 of said act, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, and that certain of the assorted replacement parts were more specifically provided for as parts of internal combustion engines of the carburetor type in said paragraph 372, as modified, and are likewise subject to assessment at only 17½ per centum ad valorem. In

other words, it is plaintiff's basic premise herein that gasoline-driven power saws are not entireties for customs purposes, and that at least the engine portion thereof, and parts of the same, are separately classifiable.

The pertinent portions of the respective tariff provisions read as follows:

Paragraph 372 of the Tariff Act of 1930:

\* \* \* all other machines, finished or unfinished, not specially provided for, 27½ per centum of valorem: *Provided*, That parts, not specially provided for, wholly or in chief value of metal or porcelain, of any of the foregoing, shall be dutiable at the same rate of duty as the articles of which they are parts: \* \* \*

Paragraph 372 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, *supra*:

Internal combustion engines, finished or unfinished, not specially provided for:
    Carburetor type_____17½% ad val.
    \*       \*       \*       \*       \*       \*       \*
Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any articles provided for in any item numbered 372 in this schedule, shall be dutiable at the same rate of duty as the articles of which they are parts.

At the trial three witnesses testified for plaintiff and there were received in evidence, in plaintiff's behalf, seven documentary exhibits to which we shall hereinafter refer. The Government offered no testimony.

The first witness called was S. S. Birks, examiner of merchandise at the port of Seattle for over 25 years. He stated that he had examined the merchandise which is the subject of the instant protests and described the same in the following manner:

A. The saw machine is composed essentially of the gasoline driven engine which in turn—the gasoline powered engine, pardon me—which in turn drives the gears and mechanism of the gearhousing. Attached to that is what is known as a cutter bar, a long, flat piece of steel with a groove cut around the edge of it. In that groove a flexible chain with sawteeth is caused to be operated by means of the driving portions of the gearhousing. On the end of the cutter bar is fixed an outer end handle assembly, as it is sometimes termed, or tailstock assembly which is merely a holding device for the second man on the cutting team to hold and assist in directing the saw blade against the cutting operation on the timber. It also embodies an oiling attachment to keep the saw chain oiled during its operation.

Q. I think you omitted the handlebar.—A. I did. The handlebars are attached to the engine assembly for the convenience of the first operator for holding the bulk of the machine's weight in usage.

Referring to plaintiff's illustrative exhibit 1, an "Instruction Manual and Parts List for Model 'F' 7000 Series Power Chain Saw," issued by Industrial Engineering, Ltd., hereinafter referred to as I. E. L., the Canadian manufacturer of the involved power saws, Examiner Birks noted that illustrations of the complete articles appear on pages 1 and 2 of said exhibit; that on page 5 thereof, there

is a cross-section diagram of the engine, which he described as being an internal combustion engine, carburetor type; that page 16 contains a picture of the handlebar assembly of the power saw; page 17 shows the gearhousing assembly, page 18, the tailstock assembly, and page 19, the cutter bar and chain.

Asked to state the respective values of the various assemblies, the witness enumerated them as follows:

A. The value of the engine unit alone is slightly under 50% of the value of the entire sawing machine; the value of the gearhousing assembly is approximately 28%; the value of the handlebar assembly, approximately 4%; the value of the cutter bar, approximately 6%; the value of the cutting chain, approximately 5% and the value of the tailstock assembly, approximately 7%.

He then stated that I. E. L. issued price lists which separately valued the different assemblies.

With respect to the assorted replacement parts included in the invoice of the shipment at bar, Birks testified that he marked on the invoice a green letter "x" next to the items which are parts of the gasoline engine, a double "xx" in green ink to refer to parts of the gearhousing assembly, and that he left unmarked parts of the handlebar and tailstock assemblies, cutter bars, sawing chains, or cutting attachments.

The witness further stated that he had handled this type of saw for about 8 years, including, in addition to the Model F power saws, other saws manufactured by I. E. L. and its predecessors, the P. M. saw produced by the Power Machinery, Ltd., and the Hornet saw; that he had also seen some American-made saws; that all of them "are quite similar in design" and "embody the same principles of power being applied to a movable chain bearing teeth"; and that ordinarily they are powered by gasoline engines, but sometimes by compressed air or electric engines.

On cross-examination, Birks testified that the engine, handlebar, and gearhousing assemblies, and the other parts, are parts of the complete assembly known as a power saw; that none of these separate parts could operate in performing the function of this machine without all the other parts; and that there would be no complete power saw without each integral part. He further stated that it might be possible to utilize the engine in the performance of other functions, but the engine would probably have to be adapted for such other uses, and different attachments would be required.

James McKee testified that since 1945 he has been in the sales and service department of I. E. L. Power Saws, Inc., of Seattle, an importer and the American sales representative of I. E. L. of Vancouver, British Columbia, and that prior thereto, for a period of 7 years, he was an aircraft mechanic. In the course of his work, he goes into the field whenever trouble develops and repairs and checks the product in operation. This work includes servicing saws of the character

depicted in plaintiff's illustrative exhibit 1. As a result of this servicing, he has become familiar with the construction of the Model F and of the newer types of power saws.

McKee stated further that he has taken apart saws such as shown by plaintiff's illustrative exhibit 1 at the rate of four or five a day. The operation of separating the engine from the remainder of the unit involves the removal of the cutter bar and engine and the handlebars and takes about 15 minutes. To get the engine alone, it is also necessary to remove the transmission or gearhousing assembly, which is attached to the engine by 4 or 8 studs or nuts. These can be released with a monkey wrench.

This witness also testified that I. E. L. Power Saws, Inc., issues price lists which relate in part only to the value of the gasoline engine, and a copy of such price list, produced by him, was received in evidence as plaintiff's exhibit 2. This exhibit shows a separate price listing for the motors of the "Pioneer One-Man" and "Pioneer Super-Twin" power saws, but carries no price for the motor of the "Two-Man Type" saw.

It further appears from the testimony of this witness that I. E. L. presently manufactures a saw similar to the imported model, which is called the "51 Super Twin," and is illustrated in a booklet introduced in evidence as plaintiff's illustrative exhibit 3. The similarity of the two models rests in the fact that they are both gasoline-driven through the carburetor and contain the same elements of engine, gearhousing assembly, cutter bar, and so forth. They differ slightly in form, design, and horsepower. Plaintiff's exhibit 4 is a copy of an invoice covering a sale of a "Super Twin" motor. A subscribed memorandum on this invoice lists prices for saws complete with cutter bar and chain. Other power saws than those manufactured by I. E. L., such as McCulloch, Titan Power Saws, Mall, and the P. M., are all substantially of the same design with engine, gearhousing, handlebars, tailstocks, cutter bars, and chains.

When asked to state the function of an internal combustion engine, McKee replied that it explodes fuel to develop power, and that is what the engine portion of the imported saw does. He was of opinion that there were practical uses for the engines of power saws other than driving the chain. It can be used with a boring or auger attachment for drilling holes, the auger being inserted in place of the cutter bar and chain, as shown on plaintiff's illustrative exhibit 5, in connection with a Model 6 saw, and as advertised in plaintiff's exhibit 7. The McCulloch Co. also has on the market an auger attachment for its power saw, which is illustrated in plaintiff's illustrative exhibit 6. That attachment is larger in diameter than the Model 6 auger, and is used for drilling post holes. The power saw engine can also be used to drive a pump or to propel a boat.

On cross-examination, McKee stated that when the engine portion of the machine was removed, the machine was not capable of performing any cutting operation; that it could not so function if the gear-housing or any other part were removed; and that the engine in use in the Model F power saw was one adapted in horsepower for performing sawing operations, although, undoubtedly, a boring assembly could be attached to it or any other type of power saw engine.

He further stated that all of the parts involved in the instant importation were repair parts for the Model F, but in an emergency could be used for other types of saws; that sometimes a longer cutter bar would be obtained to replace a shorter one on the machines; and that the bar and chain and other portions of the Model F are suitable for use with a power saw driven either by an electric motor or by air.

With respect to the use of a power saw engine on a boat, the witness stated that he saw the engineer take a standard P. M. saw, and, by removing the sprocket which drives the cutting chain and putting a universal connection on that shaft, "they took their drive to their propeller or through the shaft." In other words, the engine had to be adapted before it could propel a boat.

This witness also explained the differences existing in the earlier and later model power saws produced by I. E. L., and indicated that the later models have a greater horsepower and are lighter in weight, although fundamentally they are all the same.

Bruce Milbourn, a salesman for I. E. L. Power Saws since 1948, testified to the sales practices of his company. He stated that he has sold all of the various models produced; that he sold complete saws and also portions of saws; that, in many instances, he sold the motor only; that for every 1,000 complete twin saws, he would sell about 400 motors; that with the one-man saws, the proportion of motors only sold ran about 10 to 15 per centum. In endeavoring to overcome Government counsel's objection that the testimony of this witness was immaterial because it related to transactions in the United States subsequent to the date of importation, counsel for plaintiff stated:

* * * They [the engines] are all essential and it has been proven the engines were designed for use as a part of power saws and I am seeking to show that such *portions of power saws* are sold as engines. [Italics supplied.]

At the conclusion of the trial, counsel for the Government moved to incorporate the record and samples in *Geo. S. Bush & Co., Inc.* v. *United States*, 38 C. C. P. A. (Customs) 30, C. A. D. 435. While in effect conceding that the merchandise involved in the case sought to be incorporated was substantially the same in principle as that here involved, counsel for plaintiff objected to the motion on the ground that the issues of law were different, citing rule 20 of the Rules of the

United States Customs Court, effective November 1, 1949. It is there provided in part:

RULE 20. RECORDS INTRODUCED IN EVIDENCE

· When a case is under consideration which involves questions of law and fact substantially the same in character as were involved in another case which has been previously decided, or tried and submitted to the court for decision, the record, or any part thereof, in such previous case may, within the discretion of the court, be admitted in evidence in the pending case upon motion of either party:

An examination into the record of the decided case reveals that, although the protest included a claim such as that here made that the engines of the there-involved power saws were separately dutiable within the provisions of paragraph 353 or 372, as modified by the trade agreement with the United Kingdom, *supra*, as internal combustion engines, the case was tried and briefed in both this court and the Court of Customs and Patent Appeals on the theory only that the merchandise fell within the provision of paragraph 340 of the Tariff Act of 1930, as other saws.

The following statement of the trial court in the decided case (22 Cust. Ct. 120, C. D. 1169) bears directly upon this point:

Whether or not the cutter bar and cutter chain, if imported separate and apart from the other mechanism, would be classifiable under said paragraph 340 or under said paragraph, as amended, we need not here decide, because there is no claim that the imported merchandise is properly dutiable other than as an entirety. Moreover, the construction of the sample before us strongly indicates that it was intended for use, and usable, only as an entirety.

Furthermore, it is noted that the brief of counsel for defendant in the instant case does not press the motion. Accordingly, we find that the issues of law and fact in the case sought to be incorporated are not the same as those before us, and the motion of defendant is denied. ·

On the merits, it is urged on behalf of plaintiff that the importation at bar is not an entirety, but rather that the engine is separately dutiable under the *eo nomine* provision of the British Trade Agreement, *supra*, for internal combustion engines of the carburetor type. In support of this contention, plaintiff argues that elements of an article imported together and intended to be used together are not necessarily an entirety for tariff purposes; that the language of the tariff provision and its administrative or legislative history are important considerations bearing upon the subject of whether an importation is an entirety; that the interdependence of the elements in an importation are important in determining whether they are entireties; and that segregation is favored where one or more of the elements of an importation are *eo nomine* provided for.

Many cases are cited in the brief of the importer to substantiate these general propositions; and these cases and others have had our careful review and analysis. We do not find, however, that as to the

facts and the law involved in this case they require a finding and decision favorable to the plaintiff.

The case of *Altman & Co.* v. *United States*, 13 Ct. Cust. Appls. 315, T. D. 41232, relied upon by both parties, is perhaps the outstanding decision on the question of what constitutes an entirety for customs purposes. There, the importation consisted of corsets and lace trimmings. Pinned to each piece of lace was a label with words and figures indicating a number and size corresponding to one of the corsets in the importation. Despite testimony that the corsets and lace trimmings were sometimes sold separately, the court found they were designed and intended to be used together as a completed article of commerce. After reviewing various cases concerned with the problem of entireties, the court stated:

A consideration of these pronouncements of the courts leads to the conclusion that if an importer brings into the country, at the same time, certain parts, which are designed to form, when joined or attached together, a complete article of commerce, and when it is further shown that the importer intends to so use them, these parts will be considered for tariff purposes as entireties, even though they may be unattached or inclosed in separate packages, and even though said parts might have a commercial value and be salable separately.

This principle has been applied whenever subsequently the question of entireties has been in issue, modified only in the respect that each of the component parts must be essential to the complete entity, and so merged therein as to have lost its identity as an independent article. See *D. Salemi & Sons* v. *United States*, 19 C. C. P. A. (Customs) 43, T. D. 44892; *United States* v. *Kronfeld, Saunders, Inc.*, 20 C. C. P. A. (Customs) 57, T. D. 45679; *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47052; *United States* v. *H. K. Miyaka*, 22 C. C. P. A. (Customs) 38, T. D. 47039.

Where, however, the components, whether or not designed to be used together, preserved their separate identities, were not essential each in the use of the others, and did not merge to form a new and distinct article of commerce, they were held to be segregable for tariff purposes. See *Sheldon & Co.* v. *United States*, 14 Ct. Cust. Appls. 108, T. D. 41591; *Lang Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 341, T. D. 42495; *United States* v. *Kalter Mercantile Co. et al.*, 11 Ct. Cust. Appls. 540, T. D. 39680; *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 22 C. C. P. A. (Customs) 281, T. D. 47330. *A fortiori* merchandise which is merely commingled lies outside the scope of the doctrine of entireties, such merchandise being collectively dutiable at one rate only by virtue of the provisions of section 508 of the Tariff Act of 1930, which are not here applicable.

An apparent but not actual departure from these established principles is the case of *Columbia Shipbuilding Co. et al.* v. *United States*, 11 Ct. Cust. Appls. 281, T. D. 39085, where certain steam engines, designed to be operated with Howden fans or blowers in

supplying a forced draft to the boilers of vessels, were held to be separately dutiable within the *eo nomine* provision for steam engines in paragraph 165 of the Tariff Act of 1913. There, however, each article retained its separate identity and use; they were not physically connected, except by a temporary coupling; and they did not combine to perform a single new function. In holding that these articles were not entireties, the court stated:

> With this description of the articles before us, we conclude that the engines and fans as imported were not entireties, notwithstanding the fact that they were designed to be operated together; for when the articles are installed for use *each retains its own name and essential character, and neither one becomes in fact a part of the other*. Nor do they then merge or unite so as to form together a new or distinct article having a different name or character. When in use the engine simply performs the function of an engine and retains its name as such, and the fan performs the function of a fan only and retains its separate name also. [Italics supplied.]

Throughout the record before us it is clearly made to appear that there is an article of merchandise which is known both commonly and to the trade and commerce of the United States as a gasoline-driven power saw. This article in its finished and complete state is an aggregate of various assemblies and parts, each of which is essential to the proper functioning of the whole, and each of which loses its separate name and character when united with all of the others. Each of the parts is designed for and intended to be attached to and used with all the others in the ultimate operation of sawing trees and lumber. The article, being known and described as a "gasoline-driven power saw," normally functions with an internal combustion engine of the carburetor type. It cannot operate without such engine, unless adaptations and modifications are made for the use of electric motors or air compressors. Neither can the engine of a gasoline-driven power saw, without adaptation, be devoted to any other use.

The circumstance that there are presently on the market certain auger attachments for some models of power saws, to be used for boring holes in lumber, scarcely serves to negate the proposition that the engine of a gasoline-driven power saw is an essential element of the complete entity. Each of the exhibits in evidence, illustrative of auger attachments, makes it abundantly clear that when the machine is utilized for the purpose of drilling holes, not only the engine, but the gearhousing assembly, the handlebar and tailstock assemblies, and all the other parts of the power saws, except the cutting bar and chain of the mechanism, are retained. Thus, it is apparent that the auger attachment is, as its name implies, an additional or substitute accessory for use with the components of the pre-existing power saw.

As stated by the court in the *Altman* case, *supra*:

> It is manifest, from a consideration of these facts, that these goods were imported for the purpose of making therefrom a finished and completed article of commerce; that the various parts were designed to be used together and not separately, and

that this was, in fact, the actual major use which was made of them by the importers.

The foregoing quotation applies with equal vigor to the facts of the instant case. The various component parts at bar were designed and intended to be used together and not separately, and were to be made into a finished and completed article of commerce in which each of its essential elements lost its individual identity and became submerged in the whole.

It seems to us that the *Bush* case, *supra*, could not have been decided as it was without a latent appreciation of the fact that the power saws there involved were entireties, although, as heretofore noted, that issue was not raised in the case. It will be recalled that it was there the contention of the importer that power saws were more specifically provided for in paragraph 340 of the Tariff Act of 1930, as modified by the trade agreement with Sweden, 68 Treas. Dec. 19, T. D. 47785, as other saws, than in paragraph 372 of said act, as machines, not specially provided for. This court stated specifically that:

* * * The cutter chain in the present importation is able to function and operate only when it has applied thereto the power generated by the gasoline motor which is an inseparable part of the importation. It is therefore clear that the sawing machines here involved are not covered by and included within the provision for "* * * and other saws, not specially provided for, * * *" contained in said trade agreement. * * *

\* \* \* \* \* \* \*

* * * While it is true that the Congress has made provision in paragraph 340 for power-operated saws, there is nothing to suggest that the Congress intended to include within and as a part of the provision for "saws" the machines which furnish the power for their operation, particularly when the saw *per se* is only an infinitesimal part of the entire mechanism. There is no provision in said paragraph 340 for sawing machines.

It thus appears that the compelling reason for the conclusion reached by this court was that a power saw was something "more than a saw," and this conclusion was affirmed by our appellate court.

Predicated upon plaintiff's showing in the instant case that the P. M. power chain saws involved in the *Bush* case, *supra*, were substantially similar to the Model F saws at bar, and by a similar process of reasoning, it may likewise be said that the instant power saw is something more than its engine, and that the motor is able to function and operate as a power saw only when it is driving the cutter chain which is an inseparable part of the importation.

Accordingly, we conclude that the engines included in the importation in controversy are not separately dutiable within the provisions of paragraph 372, as modified, as internal combustion engines of the carburetor type, and that the collector properly classified them, together with the other components of the four complete power saws, as machines, not specially provided for.

Under this view of the case, the various parts of the engines, identified on the invoice by a green letter "x" are likewise more specifically provided for as parts of machines, not specially provided for, than as parts of internal combustion engines, on the theory that an integral, constituent, or component part of a part is dutiable as a part of the whole. *Landay Bros.* v. *United States*, 5 Ct. Cust. Appls. 498, T. D. 35151; *Richardson Co.* v. *United States*, 8 Ct. Cust. Appls. 179, T. D. 37289; *United States* v. *American Express Co.*, 29 C. C. P. A. (Customs) 87, C. A. D. 175.

Upon the foregoing considerations, the claims in the instant protests are in all respects overruled. Judgment will be entered accordingly.