GEO. S. BUSH & CO., INC. *v.* UNITED STATES (No. 4749)[1]

[1] C. A. D. 525.

United States Court of Customs and Patent Appeals, June 3, 1953

*Lawrence, Tuttle & Harper* (*George R. Tuttle* and *Lawrence A. Harper* of counsel) for appellant.

*Charles J. Wagner*, Acting Assistant Attorney General (*Arthur R. Martoccia*, special attorney, of counsel), for the United States.

[Oral argument April 13, 1953, by Mr. Tuttle and Mr. Martoccia]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Second Division, entered pursuant to its decision C. D. 1429, 28 Cust. Ct. 308.

Two separate protests, consolidated for trial and overruled, claimed that gasoline engines, carburetor type, and four saws, imported at the port of Seattle in a knocked-down condition, together with an assortment of parts, were improperly classified as entireties by the Collector of Customs as machines and parts thereof not specially provided for and assessed by him with duty at the rate of 27½ per centum ad valorem under the provisions of paragraph 372 of the Tariff Act of 1930 as modified by the trade agreement with the United Kingdom, T. D. 49753.

Appellant claimed the parts which constituted the gasoline engine should have been assessed at 17½ per centum under paragraph 372 as amended by T. D. 49753; and the imported parts, other than the engine, should have been likewise assessed at 17½ per centum ad

valorem under the same trade agreement as parts of internal combustion engines.

Appellant introduced the testimony of three witnesses and submitted seven exhibits. The controversy between the parties does not however concern the essential facts, but their legal significance. The Government in its brief observes (1) that under an amendment to appellant's protest, appellant contended the engine portion of each imported saw should have been constructively segregated, and (2):

The invoice covered four complete saws and a list of parts, and appellant contended that these parts also should have been constructively segregated. The Collector classified the imported gasoline powered saws [and the parts] as entireties, and assessed them under paragraph 372 of the Act itself at 27½ per centum ad valorem as machines not specially provided for and parts thereof * * *.

The issue presented involves the question of whether the units of the imported merchandise constitute an entirety for customs purposes.

The pertinent provisions of the Tariff Act and the British Trade Agreement read:

Paragraph 372:

all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem; *Provided*, That parts, not specially provided for, wholly or in chief value of metal or porcelain, of any of the foregoing, shall be dutiable at the same rate of duty as the articles of which they are parts: * * *.

Paragraph 372, as amended by T. D. 49753:

Internal-combustion engines, finished or unfinished, not specially provided for:

Carburetor type_____ 17½ % ad val.

Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any articles provided for in any item numbered 372 in this schedule, shall be dutiable at the same rate of duty as the articles of which they are parts.

Each machine, when the imported parts were put together, was composed of various assemblies, pictured by appellant's Illustrative Exhibit 1. Appellant's witness Birks stated he was able to give the relative values to the whole of those several assemblies or portions:

Q. Will you do so, please, Mr. Birks? A. The value of the engine unit alone is slightly under 50% of the value of the entire sawing machine; the value of the gearhousing assembly is approximately 28%; the value of the handle-bar assembly, approximately 4%; the value of the cutter bar, approximately 6%; the value of the cutting chain approximately 5% and the value of the tailstock assembly, approximately 7%.

The trial court in sustaining the action of the collector referred to the case of *Altman & Co.* v. *United States*, 13 Ct. Cust. Appls. 315, T. D. 41232, as "perhaps the outstanding decision on the question of what constitutes an entirety for customs purposes" and remarked:

There, the importation consisted of corsets and lace trimmings. Pinned to each piece of lace was a label with words and figures indicating a number and size corresponding to one of the corsets in the importation. Despite testimony that the corsets and lace trimmings were sometimes sold separately, the court found they were designed and intended to be used together as a completed article of commerce. After reviewing various cases concerned with the problem of entireties, the court stated:

> "A consideration of these pronouncements of the courts leads to the conclusion that if an importer brings into the country, at the same time, certain parts, which are designed to form, when joined or attached together, a complete article of commerce, and when it is further shown that the importer intends to so use them, these parts will be considered for tariff purposes as entireties, even though they may be unattached or inclosed in separate packages, and even though said parts might have a commercial value and be salable separately."

The trial court in the instant case further remarked:

This principle has been applied whenever subsequently the question of entireties has been in issue, modified only in the respect that each of the component parts must be essential to the complete entity, and so merged therein as to have lost its identity as an independent article.[1]

Where, however, the components, whether or not designed to be used together, preserved their separate identities, were not essential each in the use of the others, and did not merge to form a new and distinct article of commerce, they were held to be segregable for tariff purposes.[2]

The court below rejected the pertinency of the principle last named and decided that the law applicable to the corsets and lace involved in the *Altman* case "applies with equal vigor to the facts of the instant case," namely:

It is manifest, from a consideration of these facts, that these goods were imported for the purpose of making therefrom a finished and completed article of commerce; that the various parts were designed to be used together and not separately, and that this was, in fact, the actual major use which was made of them by the importers.

The court further concluded that the various component parts at bar were made into a finished and completed article of commerce so that each of its essential elements lost its individual identity and became submerged in the assembled mechanism.

The trial court noted that among appellant's exhibits were imported auger attachments which when segregated and assembled constituted an additional or substitute accessory for use with the power saw and that—

when the machine is utilized for the purpose of drilling holes, not only the engine, but the gearhousing assembly, the handlebar and tailstock assemblies, and all the other parts of the power saws, except the cutting bar and chain of the mechanism, are retained.

[1] Citing *D. Salemi & Sons v. United States*, 19 C. C. P. A. (Customs) 43, T. D. 44892; *United States v. Kronfeld, Saunders, Inc.*, 20 C. C. P. A. (Customs) 57, T. D. 45679; *United States v. Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050; *United States v. H. K. Miyaka*, 22 C. C. P. A. (Customs) 38, T. D. 47039.

[2] Citing *Sheldon & Co. v. United States*, 14 Ct. Cust. Appls. 108, T. D. 41591; *Lang Co. et al. v. United States*, 15 Ct. Cust. Appls. 341, T. D. 42495; *United States v. Kalter Mercantile Co. et al.*, 11 Ct. Cust. Appls. 540, T. D. 39680; *United States v. Hensel, Bruckmann & Lorchbacher, Inc.*, 22 C. C. P. A. (Customs) 281, T. D. 47330.

On the separate use of the auger as a segregated entity, the witness McKee testified in response to questions by appellant's counsel:

Q. Are all of the saws, whether domestic or foreign, substantially the same design, the gearhousing the cutter bar and the chain and tailstock? A. Yes, they are.

Q. Do you know of uses for the engines of such saws other than in driving the chain or the cutter chain? A. Yes, I do.

Q. Commercial practical uses? A. Yes.

Q. What are they, if any? A. Our own company manufactures a boring attachment that is used on what in the logging business is known as booming grounds.

Q. Is there a picture of it in this pamphlet? A. Yes, sir.

Q. Describe it a little more, the boring attachment? A. That is an attachment that is applied to the front of your engine driving an auger which drills through the timber to make a hole that a chain can be dropped through and the logs fastened or tied together.

Q. In other words, if you are out logging and you are going to float your logs away, in making up your float you take your power saw and put on the boring attachment in place of the cutter bar and chain, etc., and use it in drilling these holes; is that correct? A. That is correct.

Appellant asserts that the essential error of the trial court resides in its disregard of the fundamental rule of customs law that merchandise exported from another country must be classified and assessed here on the basis of the condition in which it is imported. Appellant also cites and relies upon the doctrine promulgated in the case of *Columbia Shipbuilding Co. et al.* v. *United States*, 11 Ct. Cust. Appls. 281, T. D. 39085.

There our court reversed the judgment of the Customs Court which had held that an imported engine and fan were dutiable as an entirety as a manufacture of metal. We there quoted the applicable law to the following effect:

It seems clear, therefore, that the engines in question were dutiable under the *eo nomine* provision for all "steam engines," contained in paragraph 165. A steam engine may be used to operate a pump, a saw, a lathe, or other machinery, and it may transmit power by means of a belt or a power shaft, or by means of a temporary coupling, as in the present case, but so long as it retains its essential characteristics and maintains its separate name and identity as a steam engine it may claim classification for duty as such under the provision in question. And this applies to the engine now in question, for it does the work of a steam engine only, and no reason appears for excluding it from the comprehensive enumeration of "*all* steam engines" in paragraph 165.[3]

Counsel for appellant takes the position (1) that the British Trade Agreement hereinbefore described created, *eo nomine*, a new tariff entity, "Internal combustion engines, * * * Carburetor type," and "Parts, not specially provided for, wholly or in chief value of met-

[3] Appellant in its brief notes the similar uses, characteristics, and the variety of purposes for which a gasoline engine such as is here involved supplies power and the ways in which it is connected with the machine which it operates, citing and quoting extensively from the Columbia Encyclopedia, 1940 Ed., pp. 695-6.

al, * * *," which by their very nature are power-producing machines designed and intended to serve power-utilizing mechanisms; and (2) that the merchandise listed in the agreement constitutes a tariff entity distinct from the "other machines" enumerated in paragraph 372 and, although imported together in separate packages, are readily segregable and should be separately classified and assessed as a matter of law.

There is no dispute that the engine here in issue is an internal combustion engine, the function of which is to take fuel into its carburetor and thereafter explode it in the development of power. As stated by appellant's witness McKee:

You have your carburation, your sparkplugs, your handles, your piston and connecting rods and crankshaft which are part of any internal combustion motor.

Appellant emphasizes the fact that because the engine in issue supplies the power for the sawing mechanism and can be attached thereto does not cause it to lose its identity as an internal combustion engine and quotes the following pertinent excerpt from the decision written for the Customs Court by Judge Dallinger in *Gresham* v. *United States*, Abstract 24838, 64 T. D. 810:

As defined in Knight's *American Mechanical Dictionary* (vol. 1, p. 802) an engine is "a machine which acts automatically, both as to power and operation," and is "distinct from a *machine* in its ordinary acceptation, whose motor is distinct from the operator." The same authority (vol. 2, p. 1366) describes a machine as "an instrument of a lower grade than an *engine*, its motor being distinct from the operating part, whereas the *engine* is automatic as to both."

The record discloses that the saws imported in the present case can be driven not only by the gasoline engine but also by electricity or compressed air; that the imported engine can be used for supplying the power for driving an auger, a pump, or a motor boat, and is not the only type of engine essential to the operation of the imported sawing mechanism.

The courts have long recognized that use with other machines does not preclude "engines" from having a separate and segregable tariff status. Whether an imported engine is dutiable as such, or whether it is merged for tariff purposes into the article for which it supplies the power, has depended on the intent of Congress and the relative specificity of the competing paragraphs of the respective tariff acts; e. g., *Central Aguirre* v. *United States*, T. D. 37615; *G. W. Sheldon & Co.* v. *United States*, T. D. 42315. See also *Enrique Abarca and U. Casal* v. *United States*, 18 C. C. P. A. (Customs) 370, 372, T. D. 44617, where our court in part stated:

Steam engines are specified by name in Title I (the dutiable list) of the act, and the proviso to paragraph 1504 * * * expressly forbids their being classified under said paragraph, unless we could say that being steam engines of a special type renders them, for tariff purposes, not steam engines but something else. Such a holding would be extremely fantastic under the statute as worded.

Appellant contends that the court below failed to recognize that there are not two but three elements which constitute a power driven mechanism, such as is here involved, namely: (1) the power-producing unit, (2) the power-utilizing unit, and (3) the attachments which connect them, and that the court's alleged confusion is disclosed in its statement:

The article, being known and described as a "gasoline-driven power saw," normally functions with an internal combustion engine of the carburetor type. It cannot operate without such engine, unless adaptations and modifications are made for the use of electric motors or air compressors. Neither can the engine of a gasoline-driven power saw, without adaptation, be devoted to any other use.

The record indicates that different means of attachment might or would have to be employed from that used with the imported saws should the imported engine be detached and other power producing units used. There is absolutely no evidence however, appellant declares, that the engine itself must be altered to make it function as a power producing unit for various purposes which the engine will otherwise serve, nor that the sawing mechanism itself must be altered when propelled not by the gasoline motor but otherwise by compressed air or electric power.

The testimony of the witness McKee leaves no doubt that the simple removal of four to eight bolts or studs with a monkey wrench would detach the engine for other uses from the sawing mechanism. Appellant further notes that other cases present the view:

Also it is an obvious inference from the record as a whole that the engines were separated from the sawing mechanism "to make repairs or to substitute a new" engine or attachment, a point which was stressed in Denike v. US, 5 Ct. Cust. Appls. 364, T D 34553 when locomotive wheels and axles were found to be "readily segregable" from their tires.

To recapitulate: We note that in the disposition of the issue here involved the trial court relied upon the rule of the Altman case wherein "the lace was cut and separately prepared to be used on the particular corset it accompanied and no other, and could not be used, practicably, in any other way," as observed by our court in Lang v. United States, 15 Ct. Cust. Appls. 341, 342, T. D. 42495. We think, however, as properly stated in United States v. Myers & Co., 11 Ct. Cust. Appls. 409, T. D. 39322, wherein the skins and veal of imported carcasses of calves were held separately classifiable for tariff purposes—

that the question herein submitted finds its answer in the established rule that where an importation consists of two distinct and segregable tariff entities, which, however, are attached to one another or commingled together, they should nevertheless be separately treated in the assessment each accordingly bearing the rate of duty applicable to it, or admitted free of duty if entitled thereto.

In the case at bar the gasoline engine is not indispensable as the power producing element in the operation of the saws because elec-

tricity or compressed air may likewise provide the power to effect the same result; that the gasoline engine may be readily detached from the saw assembly by the removal with a monkey wrench of four or eight nuts, depending on the model of the saw; that when so detached, or in the first instance, the gasoline engine may be used for various other purposes and in various other ways, such as driving a pump or propelling a motor boat.  To emphasize the latter point we quote the unrefuted testimony of the witness McKee in response to questions by Mr. Tuttle, appellant's counsel, concerning the same or models similar to those imported:

Q. Now, what other uses have you seen power saw gasoline engines put to? We have talked now about cutting the wood, that is, used with the saw; we have talked about post hole digging, auger drilling, and what other uses do you know? A. I have seen the engine unit used to drive a pump.

Q. Where?  I mean, in what general locality, I don't mean the exact area. A. That is on the coast here.

Q. That is out in the woods or what?   A. In the woods.

Q. You mean loggers will—   A. Where fire protection was necessary and water was available it is quite frequently that operations have a portable pump available in case of fire.

Q. Well, what part does the engine of a saw that a logger may have play in that pump?   A. Well, it would be a motor similar to his own that he is using in the saw would be on the pump.   He will have a pump; he would have a separate unit attachment.

Q. But it is the same kind of motor we are talking about here?   A. Yes.

Mr. Wagner: I didn't get that.

Mr. Tuttle: Same kind of motor we are talking about here.

Q. I shouldn't ask you questions of a certain type, Mr. McKee, that I am going to do.   Have you ever seen them used on boats?   A. I have.

Q. Describe that, please, and what you are talking about?   A. I have seen them in the factory of Power Machinery Limited, in Vancouver, a motor, power saw motor, developed or worked on by the factory engineer installed in his own boat.   It was the same unit as used in Power Machinery's saws with the propeller and shaft attachment.

The trial court held, however, that a distinctive use of the imported engines could not be effected without a basic modification of the engine or the saw mechanism.   On that point counsel for appellant correctly states, based upon the testimony of record:

The point was not argued below but what the court undoubtedly meant, and what is borne out by the record, is that different means of attachment might have to be employed for the engine to drive an auger, a pump, or a boat.   There is absolutely no evidence that the engine itself must be altered to function as a power-producing unit for the varied purposes it will serve, nor that the sawing mechanism *per se* must be altered when propelled by compressed air or electric power rather than by the gasoline motor.

\*        \*        \*        \*        \*        \*        \*

In this connection the testimony of the customs examiner, Mr. Birks, is very pertinent.   The government attorney sought to lead him to say that "the engine portion could not and would not operate" except in driving the cutter bar or

cutter chain, to which Mr. Birks replied, as befitted a candid government official, "I can't very well say for that because it might be possible to detach the engine and use it for some other purposes."

When the government attorney asked if Mr. Birks knew "whether or not to adapt the engine for other use there would be required basic changes in the attachments of the engine," he replied that "different attachments would definitely be required, of course."

In this context counsel submit the next question and answer:

XQ. So that there would be changes required to adapt it to other uses? A. Yes, definitely, means only that there would have to be changes in *the attachments,* not in the engine *per se.*

Counsel for the government argues here that the identical question here in issue was decided contrary to appellant's contention in the recent case of *Geo. S. Bush & Co., Inc.* v. *United States,* 38 C. C. P. A. (Customs) 30, C. A. D. 435. The record discloses that at the trial in the court below, government counsel moved to incorporate the record in that case, and such motion was properly denied on the stated grounds that "the issues of law and fact in the case sought to be incorporated are not the same as those before us." On the point thus raised, appellant properly states in its brief:

As far as counsel can discover, the issue here has never been presented until now. The issue here could not arise with respect to the gas-driven chain saws imported from Germany in *US* v. *Mill. & Mine Supply Co.,* 30 CCPA (Cust) 128, CAD 224, because Germany was excluded from the privileges of the trade agreement, and the first *Bush* case, 38 CCPA (Cust) 30, CAD 435, involved another question, the applicability to the importation of paragraph 340 of the act of 1930 and the Swedish trade agreement, TD 47785.

But engines are engines whether steam or gasoline, and the principles enunciated in the cases involving steam engines apply equally here. An engine enumerated in the tariff as such does not lose its character as an engine by virtue of the fact that it is going to supply power to another mechanism, whether that mechanism be an agricultural implement, a plow, a generator, or a saw.

For the reasons stated, and upon the consensus of the authorities hereinbefore cited, the gasoline engine here in issue is segregable and dutiable under the *eo nomine* provision therefor in the Trade Agreement with the United Kingdom, T. D. 49753. The evidence and authorities submitted by appellant fail however to sustain its claim that the remaining parts of the importation were not properly classified and assessed under paragraph 372 as machines and parts thereof dutiable at the rate of 27½ per centum ad valorem.

The judgment of the United States Customs Court is accordingly *modified,* being *affirmed* with respect to the imported parts, and *reversed* as to the classification and dutiable status of the gasoline engine as an unsegregable part of an imported entirety.

JOHNSON, Judge, dissents; being of the opinion that the decision of the Customs Court should be affirmed.