(C. D. 1562)

Esso Standard Oil Company *v.* United States

United States Customs Court, First Division

(Decided November 27, 1953)

*Sharretts, Paley & Carter* (*Howard C. Carter, Edward P. Sharretts,* and *Louis J. Paley* of counsel) for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*Charles J. Wagner* and *Richard E. FitzGibbon,* special attorneys), for the defendant.

*William Whynman* and *Myron J. Burkhard* as *amici curiae.*

Before MOLLISON and EKWALL, Judges

MOLLISON, Judge: This is a protest filed pursuant to section 514, Tariff Act of 1930 (19 U. S. C. § 1514) whereby plaintiff challenges the action of the collector of customs at the port of New York in classifying for duty under paragraph 1 of the said tariff act an imported material known as naphthenic acid. An additional assessment of ¼ cent per gallon imposed under section 3422 of the Internal Revenue Code (26 U. S. C. § 3422), as modified by the General Agreement on Tariffs and Trade, T. D. 51802, under a provision for "all liquid derivatives of crude petroleum" is not challenged, but plaintiff claims that the proper classification under the tariff act is under the free list provisions in paragraph 1733 for refined petroleum, or for distillates obtained from petroleum.

For convenient reference, there are set forth in the margin the pertinent portions of the paragraph under which plaintiff claims and those under which each of the assessments of duty was made.[1]

The position of the defendant, and the theory behind the assessment of duty upon the merchandise under the provision for acids, appears to be that the merchandise in its imported condition is a new product, an acid, created by chemical action between a byproduct of the proc-

---

[1] Tariff Act of 1930:

PARAGRAPH 1. Acids and acid anhydrides: * * * and all other acids and acid anhydrides not specially provided for, 25 per centum ad valorem.

PAR. 1733. Oils, mineral: Petroleum, crude, fuel, or refined, and all distillates obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for.

Internal Revenue Code (as modified by the General Agreement on Tariffs and Trade, T. D. 51802):

SEC. 3422 * * * all liquid derivatives of crude petroleum (except lubricating oil and such derivatives specified hereinafter in any item 3422), ¼¢ per gal.

esses of distilling and refining petroleum and a substance or substances other than petroleum.

The position of the plaintiff appears to be that the naphthenic acid in controversy is not a new product made from petroleum, or a by-product thereof, but is, in substance, a product extracted from petroleum by processes of distillation and refining. It asserts that these are the normal processes by which the components of petroleum are segregated and refined and that the components thus separated are the "distillates obtained from petroleum," and/or the "petroleum, * * * refined," described and provided for in paragraph 1733, *supra*.

The parties have joined issue on this basis. In addition to the rather ample record in the case at bar, defendant moved the incorporation, as part of the record in this case, of the record in the case of *Shell Eastern Petroleum Products, Inc., et al.* v. *United States*, 28 C. C. P. A. (Customs) 155, C. A. D. 138, which, in turn, had incorporated as part thereof the record in *United States.* v. *Shell Eastern Petroleum Products, Inc.*, 26 C. C. P. A. (Customs) 132, C. A. D..6.

Our rules authorize the incorporation of a record in another case "When a case * * * under consideration * * * involves questions of law and fact substantially the same in character as were involved in another case which has been previously decided, or tried and submitted to the court for decision." We have no hesitation in ruling that there is such similarity between the case at bar and the incorporated case as to warrant the exercise of our discretion to incorporate the record in the *Shell Eastern Petroleum Products, Inc., et al.* case pursuant to the motion of defendant's counsel.

However, no effort was made by the moving party to establish that the merchandise in the case at bar and that in the incorporated case were the same. We cannot find that they are the same merely because each was called naphthenic acid, in the face of evidence establishing that there is a variety of such acids. The record in the incorporated case is properly before us, but we cannot assume that the evidence therein, which describes the characteristics and properties of the merchandise in that case, necessarily applies to the merchandise in the instant case. Defendant did not establish such identity.

A review of the entire record in the case at bar shows that naphthenic acids occur as one of the natural constituent parts in almost all types of crude petroleum, but that it is economically feasible to recover them from only certain crudes, of which one is the particular crude which was the source material of the merchandise at bar. Two steps were involved in separating the naphthenic acid at bar from the crude oil that was taken from the earth. In the distillation of the crude petroleum in Aruba, Netherlands West Indies, from whence the imported merchandise came, the naphthenic acid in controversy came

off the still, combined with that fraction of distilled petroleum known as gas oil. This was the first step.

Excessive naphthenic acid depreciates the value of gas oil as a fuel, but, conversely, naphthenic acid alone is valuable for a variety of uses. It serves as a dryer in paint. A more recent and possibly significant use is in the manufacture of napalm, or jellied gasoline, an ingredient in the preparation of incendiary bombs and shells.

In the second step, following the distillation process, the so-called gas oil feed stock (the combination of gas oil and naphthenic acid) was placed in a dilute aqueous solution of caustic soda. The quantity of caustic soda used was designedly insufficient to neutralize completely all the naphthenic acid present. The mixture was agitated with air and allowed to settle. The gas oil, being the lighter component of the mixture, settled on top of the heavier so-called "aqueous phase," and the two were mechanically separated.

The "aqueous phase" was placed in a tank to which was added dilute sulfuric acid. After mixing by blowing with air the solution was allowed to settle and separate into water and naphthenic acid. The water was discharged into a sewer and the naphthenic acid which remained was washed with water to remove mineral acids and soluble salts, transferred to another tank, and blown with air to drive off any water remaining.

The chief point of difference between the plaintiff and defendant concerns the physical and chemical situation which obtains in the so-called "aqueous phase." On behalf of the plaintiff, it is urged that that phase upon separation from the gas oil contains essentially naphthenic acid and sodium hydroxide in equilibrium with sodium naphthenate and water; that the acidification of the aqueous phase with dilute sulfuric acid affects the equilibrium in such manner as to regenerate the original naphthenic acid.

On behalf of the defendant, it is urged that a chemical reaction took place in the process of separating the naphthenic acid from gas oil and involved a chemical union of naphthenic acid and caustic soda which resulted in sodium naphthenate and water; that when the sodium naphthenate was treated with sulfuric acid it necessarily followed that the naphthenic acid thus produced derived its hydrogen atom from the sulfuric acid and was, therefore, not the same material as was taken from the earth.

A similar argument was advanced by the defendant in the incorporated case and adopted by this tribunal as its reason for overruling the protest therein. Our judgment was affirmed on appeal. The brief of the plaintiff in this case is devoted largely to a technical explanation of the physical and chemical situation which obtained in the "aqueous phase" and its treatment, and arguments addressed to the fundamental proposition that the situation did not result in the destruction of one

naphthenic acid and the creation of another. Rather, it is contended, that the process was one of chemical separation of the various constituents of the aqueous phase which neither created nor destroyed any of them. Defendant has offered no detailed answer to these arguments, but has contended generally that there is nothing in this case which was not heretofore considered in the *Shell Eastern Petroleum* case, *supra*.

The evidence offered on behalf of the respective parties is in the form of oral testimony, charts, etc., of a highly technical nature. The oral evidence was given by witnesses for each side who seemingly were equally well qualified to testify concerning the nature and effects of the process in question. However, it seems clear that in large part the views and attitudes adopted by these witnesses reflected basic physical and chemical theories which were diametrically opposed and, at least to the layman, irreconcilable.

Our first approach is not to determine this difficult technical debate, but rather to attempt to understand what Congress sought to encompass by paragraph 1733 when it drafted the provision as it did. It will be observed that the paragraph provides for petroluem *eo nomine* and mentions its three forms, "crude, fuel, or refined." The provision which follows for "all distillates obtained from petroleum" suggests a group of articles which includes not only those readily identifiable with petroleum, but, as well, any product obtained from petroleum by a process or processes which includes distillation.

We will consider, first, the plaintiff's contention that the merchandise at bar is properly classifiable under the provision for "Petroleum, * * * refined." The term "petroleum" is variously defined as follows:

Webster's New International Dictionary, 2d edition, 1945:

An oily, inflammable liquid, almost colorless to black, but usually of a dark-brown or greenish hue, existing at many places in the upper strata of the earth. It has a sp. gr. of 0.6829 to 1.023 and a viscosity from less than that of water to more than that of heavy molasses. It is essentially a complex mixture of hydrocarbons with small quantities of other materials, as sulphur (usually combined), nitrogen compounds, water, and silica. * * *

Funk & Wagnalls New Standard Dictionary, 1942:

An inflammable oily liquid mixture of numerous hydrocarbons, chiefly of the paraffin series, that exudes from the earth and is extensively used for heat and light.

Encyclopedia of Chemical Technology (Kirk-Othmer, 1953), volume 10, page 89:

Petroleums are oily mixtures, consisting predominantly of hydrocarbons; * * *.

These definitions of the term are substantially in agreement with the definition of the term by witnesses for both plaintiff and defendant.

Thus, at page 34 of the record, plaintiff's witness Littmann defined the term as follows:

Petroleum is a complex mixture of organic compounds, chiefly hydrocarbons, but containing also associated nitrogen compounds, sulfur compounds, oxygenated compounds, perhaps others.

At page 125, plaintiff's witness McAteer gave this definition:

Petroleum is a natural occurring mixture, very complex in nature, that contains principally hydrocarbons and associated with other organic constituents such as nitrogen compounds, sulfur compounds, and oxygenated·compounds.

Defendant's witness Fisher defined the term as follows (tr. p. 172):

It is a complex mixture of hydrocarbons containing impurities.

Defendant's witness Shipp stated (tr. p. 235):

* * * Petroleum is a mixture of hydrocarbons with some impurities * * *.

While each of the foregoing definitions seemingly refers to petroleum in the natural or crude state, nevertheless, they represent a broad, general comprehension of the term "petroleum" alone and unmodified. It will be observed that running through all of them is the common factor that petroleum is a mixture of hydrocarbons, i. e., that it is an essential of any substance to which the term "petroleum" is applied that it contain hydrocarbons. It would seem logical, therefore, that it would be an essential of refined petroleum that at least some portion of the hydrocarbon constituent be retained in the refined product, and this is the gist of the understanding of refined petroleum possessed by defendant's witnesses Fisher and Shipp, as revealed by their testimony as follows:

Fisher (tr. p. 172):

It is essentially composed of hydrocarbons, the boiling ranges of which are controlled by the product in question.

Shipp (tr. p. 244):

If petroleum is a mixture of hydrocarbons, refined petroleum is a mixture of refined hydrocarbons, and naphthenic acids are not hydrocarbons, that is a different chemical material.

It is fair to say that, in their testimony as to their understanding of refined petroleum, plaintiff's witnesses Littmann and McAteer did not include a requirement of the retention of some portion of the hydrocarbon constituent of petroleum. While we have found no direct lexicographic authority on the point, nevertheless, a reading of the articles on petroleum in volume 10, Encyclopedia of Chemical Technology, *supra*, and volume IX, Thorpe's Dictionary of Applied Chemistry (4th ed., 1949), is convincing that a substance may not properly be denominated petroleum, either crude or refined, unless it is composed of or contains hydrocarbon constitutents or substances.

Those of the witnesses who were interrogated on the point stated definitely that naphthenic acid is not a hydrocarbon substance.

(Defendant's witness Fisher, tr. p. 173; defendant's witness Shipp, tr. p. 243.) This testimony seems to be supported by the textual authorities such as the article on "Petroleum (Composition)" in the Encyclopedia of Chemical Technology, *supra*, volume 10, pages 92, *et seq.*, and the article on "Petroleum" in Thorpe's Dictionary of Applied Chemistry, *supra*, volume IX, pages 318, *et seq.*, under the heading of "Composition of Petroleums," both of which treat of napthenic acids under the portions of the texts devoted to non-hydrocarbon constituents of petroleum.

In accordance with the foregoing, we are satisfied that the term "Petroleum, * * * refined," as used in paragraph 1733 of the Tariff Act of 1930, does not include naphthenic acids, and we so hold. This leaves for consideration plaintiff's claim that the naphthenic acid at bar is properly classifiable under that portion of the same paragraph which provides for "all distillates obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for."

Paragraph 1733 was written to give free entry to certain products of the petroleum industry. To understand the scope of the law, we are at liberty to study dictionaries defining the individual terms used therein, and it is helpful in this case to study the methods used by the petroleum industry to obtain the products which the statute purports to describe.

It is proper for us to take judicial notice of the conditions of the petroleum industry and its constant advancement in the science of refining its products. See *Richardson Co.* v. *United States*, 8 Ct. Cust. Appls. 179, T. D. 37289; *United States* v. *American Aniline Products, Inc.*, 22 C. C. P. A. (Customs) 380, T. D. 47399. In taking judicial notice of such facts, it is appropriate for us to consult the technical literature.

In the article under the subject of "Evidence" in 31 Corpus Juris Secundum, § 12, at page 516, under the caption "Mode of Ascertaining Facts Required to Be Judicially Noticed," the point is discussed as follows:

Since judicial cognizance may extend to matters beyond the actual knowledge of the judge, the judge, in ascertaining facts to be judicially noticed may resort to or obtain information from any source of knowledge which he feels would be helpful to him, always seeking that which is most appropriate. When the matter is a proper subject of judicial knowledge, the judge, in order to attain mental certainty, may require the assistance of the party who invoked his judicial knowledge, he may investigate the matter for himself, or he may pursue both courses. The scope, direction, and details of such investigation are entirely within the discretion and under the direction of the judge, uncontrolled by the rules of evidence or the wishes or suggestions of the parties; but it is the duty of the judge to pursue inquiries sufficient to make his knowledge real as far as possible, since it is just as much an error for the court to mistake a fact of which it has taken cognizance as to mistake a principle of law. * * *

Our common knowledge tells us and our research reveals that gasoline and kerosene, two of the "distillates obtained from petroleum," named in paragraph 1733, are obtained from petroleum by various methods. A small amount of usable gasoline is produced from some oil wells without any distillation or other treatment. It is obtained from other deposits of petroleum by distillation alone without other treatment. In the main, however, chemical treatments and physical blending follow the distillation process to produce an efficient and uniform product. By whatever process obtained, however, the end product is gasoline.

The distillates obtained from petroleum are seldom ready for marketing immediately after the distillation process. At page 12 of the printed record in customs appeal No. 4124, *United States* v. *Shell Eastern Petroleum Products, Inc.*, the decision in which is reported in 26 C. C. P. A. (Customs) 132, C. A. D. 6, witness Buss testified in answer to interrogatories propounded under a commission as follows:

8. State whether or not the fractions obtained by distillation from crude petroleum are ready for commercial use after the distilling process or whether or not it is necessary to refine the petroleum distillation fractions before they are ready for commercial use.—A. The fractions obtained by distillation from crude petroleum must be refined before they are ready for commercial use.

In this connection, note also the following testimony by defendant's witness Fisher herein on the point (tr. p. 155):

JUDGE COLE: Do the terms "petroleum distillates" and "raw fractions" mean the same?

THE WITNESS: Normally, yes, when we distill petroleum, various fractions from kerosene and gas oil are called raw distillates. They are normally further refined before marketing. You could not sell gasolene as a fuel right off, it has to be treated.

The merchandise at bar is obtained by treating the gas oil fraction of petroleum with caustic soda to separate its two constituent parts— gas oil and naphthenic acid. In its separated form, the portion containing the naphthenic acid—or, if it be a preferred description, the sodium naphthenate or naphthenic acid potential—is further treated with sulfuric acid to "recover" the naphthenic acid.

In the incorporated record of the *Shell Eastern Petroleum Products, Inc.*, case, *supra*, a similar process is described to separate the two constituents of the kerosene fraction into kerosene and naphthenic acid.

In Thorpe's Dictionary of Applied Chemistry, volume IX, *supra*, at page 324, under the general heading of "Refining," the following, which we believe to be significant, is stated:

Refining in the case of petroleum includes any processing applied to the crude oil to separate it into different portions, to improve the crude oil as a whole or to alter the characteristics of its fractions. The primary process in refining is frac-

tional distillation, whereby lighter and heavier portions are separated and gas, gasoline, fuel oils, lubricants, wax distillates, and asphalts are produced. The properties of these primary products are modified by various types of chemical treatment, the use of specific solid absorbents for decolorising and deodorising, and selective solvent action for removing and segregating hydrocarbon groups and impurities. Processes whereby whole crudes or their fractions are decomposed by heat to produce lower-boiling products may be broadly grouped under the heading of cracking. The term treating is commonly applied to three types of processes:

(i) Those which improve the stock by removal of undesired constituents.
(ii) Those which effect an improvement in quality by the addition of extraneous materials, either by chemical combination or by solution.
(iii) Those which alter the essential chemical structure of the hydrocarbons or other constituents of the oil fraction treated.

We are not concerned with these processes *per se*, but they are pertinent insofar as they aid us in interpreting paragraph 1733. Their value is in advising us that kerosene, gasoline, and like articles referred to by Congress as "distillates obtained from petroleum" are not produced *solely* by distillation but require as well chemical and/or physical treatment to produce articles of commerce.

It is true, of course, that in some instances petroleum fractions obtained by distillation and not otherwise treated could be used as gasoline or kerosene. But we would close our eyes to the entire science of petroleum technology if we were to hold that the products named in paragraph 1733—kerosene, benzine, naphtha, gasoline, paraffin and paraffin oil—were obtained by distillation and were otherwise untreated. Common knowledge tells us otherwise, and the extensive literature on the subject of petroleum abounds with descriptions of the complicated chemical processes employed in treating and finishing these so-called distillates.

We must assume that Congress wrote paragraph 1733 with an awareness of the conditions in the industry to which it related. We cannot conceive that it was the legislative purpose to accord free entry to kerosene, gasoline, and other named products, when derived by distillation solely, but to exclude from the paragraph articles that were commercially interchangeable in every respect if they were made by other processes or subjected to chemical treatment after distillation.

Finding as we do that the named distillates in paragraph 1733 are frequently subjected to chemical and/or physical processes after distillation, it would seem to follow that the provision for "all distillates obtained from petroleum" must be construed to embrace distillates which have been subjected to chemical and/or physical processes after distillation. It is not limited to *untreated* distillates. It involves as well those distillates which, like kerosene and gasoline, are treated after distillation for further segregation and to obtain products of commerce.

The processes employed in the merchandise at bar did not "produce" naphthenic acid. The acid in the original distilled gas oil fraction was chemically and physically indistinguishable from the end product. Several of the witnesses and much of the literature speak of the "recovery" of naphthenic acid, as though it were the restoration, after loss or damage, of the naphthenic acid which was originally present.

The purpose of the caustic soda treatment was to segregate the two constituents of the distillate and not to alter either of them. Under the defendant's version of the nature and result of the treatment, the soda combined with the naphthenic acid to form sodium naphthenate and release the gas oil. The sulfuric acid was necessary to free the naphthenate radical from the sodium and regenerate the naphthenic acid.

The greater part of the testimonial record herein deals with the discussion and interpretation of this reaction. Both parties are in agreement that the naphthenic acid resulting from this treatment is indistinguishable in its physical and chemical properties from that which was found in the original distillate. On behalf of the defendant, it is asserted, however, that the chemical process by which the end product was obtained involved a substitution of the hydrogen atom in the sulfuric acid for the hydrogen atom that was present in the original naphthenic acid and that thus a different product is obtained. The plaintiff denies that the chemical process results in the production of a different article, explaining that there is a continuous ionization in process among all of the chemical components involved in the reaction, that nothing is destroyed, and that the process can be described as a simultaneous separation and regeneration of the various elements constituting the naphthenic acid.

The fact that there may have been a substitution of hydrogen atoms in the chemical process is not determinative, from our view, because it is not of consequence in the commercial identification of the end product. From the standpoint of the petroleum industry, the distillate material was a physical mixture of two products, gas oil and napthenic acid. Separation by distillation was not practical because they had a common boiling range. Separation was accomplished by chemical extraction. No physical or chemical change in either commodity was intended and none was accomplished. The process was substantially and essentially one of extraction or segregation. The distillate, before the extractive process, was composed of two commercial products physically commingled in such manner that neither was usable with any degree of efficiency. The chemical treatment separated the two constituents of the distillate without ultimately changing the physical or chemical characteristics of either. The fact that, in the process of separation, there may have

been a substitution of one hydrogen atom for another is of no commercial significance. Moreover, when it is considered that hydrogen is the lightest in weight of all atoms and that the substitution involved only one atom per molecule of a complex chemical compound, it would appear that the substitution involved an infinitesimal portion of the entire mass, and, as it involved a substitution of a hydrogen atom for a like hydrogen atom, did not confer upon the resultant product any physical or chemical character different from that possessed by the original product.

We have said that the imported material is lacking in the hydrocarbon structure that is the definitive characteristic of petroleum. This fact is urged as a reason against classification under paragraph 1733. The answer that at once suggests itself to this contention is that the statute is not limited to petroleum in its various forms, but provides as well for "*all* distillates obtained from petroleum." [Italics ours.]

Assuming, as we must, that Congress was aware of the processes by which the distilled fractions of petroleum are further segregated into marketable products by extractive and other treatments, it seems quite clear that the law was not intended to be limited to those distillates which retained the hydrocarbon structure identifiable with petroleum. If that were its purpose, it would be limited to "petroleum distillates." It is written to include *all* distillates *obtained from* petroleum. If the mixture of gas oil and naphthenic acid is a combination of two products obtained from petroleum by distillation, then, when the two are separated, each is a distillate obtained from petroleum.

There may be differences, apparent to the scientist, between the segregation of the various components of petroleum by physical means and the use of chemical processes of extraction. Such distinctions are not determinative here because of the fundamental rule that the tariff act is not written in the language of the scientist and is not to be interpreted as if it were. *Bakelite Corporation* v. *United States*, 16 Ct. Cust. Appls. 378, T. D. 43117; *Central Commercial Co. et al.* v. *United States*, 11 Ct. Cust. Appls. 131, T. D. 38935. The use of caustic soda and sulfuric acid on this distillate accomplished no greater result, from a practical standpoint, than to segregate into marketable articles the two components of the distillate—gas oil and naphthenic acid. Commercially, the process was one of segregation. Neither of the articles was "created" by the chemical treatment since both were originally present. Neither was altered, chemically or physically, from its original form, and no alteration was intended.

Our conclusion is that the distillates obtained from petroleum, which are named in paragraph 1733, are commonly subjected to

chemical treatments subsequent to distillation to alter the chemical or physical properties of the distillate, eliminate impurities, or improve the adaptability of the product for a specific use; that Congress was aware of such processes when it provided for these articles in paragraph 1733 and did not propose that their classification should be in any sense affected by these additional treatments. The merchandise at bar was obtained from petroleum by distillation and treated with caustic soda and sulfuric acid to segregate it from the other constituents in the distillate and thus to make it a salable product. In legal principle and in practical application, this treatment does not differ from that which is given to the other petroleum products which Congress specifically named as distillates. The inference is unescapable, therefore, that Congress intended that this article should be included within the provision for "all distillates obtained from petroleum."

The only remaining question is whether naphthenic acid is more specifically provided for under paragraph 1733 as a distillate obtained from petroleum or whether the classification for acids in paragraph 1 is more specific. Neither plaintiff's nor Government counsel nor *amici curiae* has urged that the question of relative specificity was involved, probably for the reason that the question was raised and adequately briefed before the United States Court of Customs and Patent Appeals in the first *Shell Eastern Petroleum Products, Inc.,* case, and it was there held, in the decision reported in 26 C. C. P. A. (Customs) 132, C. A. D. 6, at page 138, that naphthenic acid is more specifically provided for in paragraph 1733 than in paragraph 10.

Judgment will therefore issue sustaining the protest claim for free entry under paragraph 1733 accordingly.